PEOPLE v LEE

Docket No. 78005. Argued October 6, 1988 (Calendar No. 11). Decided January 10, 1990. Rehearing denied *post,* 1203. Certiorari denied by the Supreme Court of the United States on October 1, 1990, 498 US — (1990).

Albert Lee, III, was convicted by a jury in the Kent Circuit Court, George V. Boucher, J., of first-degree felony murder. The Court of Appeals, MacKENZIE, P.J., and C. W. SIMON, J. (MAHER, J., dissenting), affirmed in an unpublished opinion per curiam, finding that because the case was decided before *People v Gonzales,* 415 Mich 615 (1982), its standards concerning admissibility of hypnotically induced testimony were not applicable, and that because the identification procedures used were not unnecessarily suggestive or conducive to irreparable misidentification, admission of the testimony of hypnotized witnesses was proper. The Court further held that admission of similar acts testimony to show identity was not error (Docket No. 51044). Following decision in *People v Nixon,* 421 Mich 79 (1984), the case was remanded to the Court of Appeals, and, on remand, the Court of Appeals, MacKENZIE, P.J., and MAHER and BEASLEY, JJ., affirmed in an unpublished opinion per curiam (Docket No. 85840). The defendant appeals.

I. In an opinion by Justice BRICKLEY, joined by Justice LEVIN, and an opinion by Justice CAVANAGH, joined by Justice ARCHER, the Supreme Court *held:*

The testimony of a hypnotized witness is inadmissible, absent proof by clear and convincing evidence that the testimony being offered was based on facts recalled and related prior to hypnosis.

1. Under the Rules of Evidence, all relevant evidence is admissible, absent prejudice, confusion, or waste of time, and all witnesses are presumed competent to testify. The relevancy of eyewitness identification is not questioned. While hypnotically induced testimony is inadmissible, a witness may testify regarding facts demonstrably recalled prior to hypnosis. The burden is on the party offering the testimony of a hypnotized

REFERENCES

Am Jur 2d, Evidence § 831.7.

Admissibility of hypnotic evidence at criminal trial. 92 ALR3d 442.

witness to establish its reliability by clear and convincing evidence.

2. The process of hypnosis is not a reliable means of accurately restoring forgotten incidents or repressed memory. In *Gonzales,* the Court stated that posthypnotic testimony was inherently unreliable. Under the doctrine of *People v Davis,* 343 Mich 348 (1955), and *Frye v United States,* 54 App DC 46 (1923), results of new scientific principles should be admitted only when the technique has gained general acceptance with the recognized field. Because the science of hypnosis itself cannot aid in distinguishing the effect on memory in specific cases, all posthypnotic testimony that is not recalled and related prior to hypnosis should continue to be considered unreliable. Until hypnosis gains general acceptance in the fields of medicine and psychiatry as a method by which memories are accurately improved without undue danger of distortion, delusion, or fantasy, the testimony of witnesses which has been tainted by hypnosis should be excluded in criminal cases. Because this case was pending on appeal when *Gonzales* was released and the hypnosis issue was properly preserved, the defendant is entitled to its application. Under the standards adopted in *Gonzales* and *Nixon,* testimony of a hypnotized witness is inadmissible, absent proof by clear and convincing evidence that the testimony being offered was based on facts recalled and related prior to hypnosis.

3. Where a reviewing court finds that evidence was improperly admitted, it must also make a determination regarding whether the error was harmless. In this case, the error was prejudicial to the defendant. Absent the testimony of the hypnotized witnesses, the remaining evidence did not positively link the defendant to this crime. Although the physical evidence was not overwhelming, even though circumstantially significant, it had limited probative value, absent the eyewitness identification of the defendant, and it cannot be concluded that all reasonable doubts would have been eliminated in the jurors' minds.

II. In an opinion by Justice Boyle, joined by Chief Justice Riley and Justice Griffin, concurring only in the result reached by Justice Brickley, joined by Justice Levin, the Supreme Court further *held:*

The similar acts evidence offered by the prosecution was admissible.

Reversed and remanded for a new trial.

Justice Brickley, joined by Justice Levin, further would hold:

1. Introduction of similar acts evidence is an exception to the

general rule that evidence of other crimes is inadmissible. In order to be admissible, the prosecution must show a high degree of similarity between the charged and uncharged acts. The policy considerations underlying the safeguards are to avoid convicting the defendant because of prior misconduct rather than on the proofs of the charged offense. Before such evidence may be admitted, there must be substantial evidence that the defendant actually perpetrated the bad acts sought to be introduced; there must be some special quality or circumstance of the bad act tending to prove the defendant's identity; the factors must be material to the determination of the defendant's guilt of the charged offense; and the probative value of the evidence sought to be introduced must not be outweighed substantially by the danger of unfair prejudice. To test whether there is a special quality or circumstance sufficient to justify admission of the evidence on the issue of identity, it is the uniqueness and distinctiveness with which both crimes were committed, combined with the proof that the defendant committed the like act, that is the key.

2. In this case, the similarities between the two incidents are that both involved a black man driving a black car, each occurred in the early morning hours when children would be walking to school, both involved young girls, and both occurred in the same general area. The manner and circumstances of the stalking and the attracting of the victims can be and is sufficiently distinctive and unique that it can pass the "signature" requirement of *People v Golochowicz.* On this record, in and of itself, the similar acts evidence is more probative than prejudicial. While the prosecutor's use of the evidence was inappropriate, on the basis of the record it was admissible.

Justice CAVANAGH, joined by Justice ARCHER, dissenting in part, stated it was an abuse of discretion for the trial court to admit the testimony of the similar acts witnesses. The similar acts testimony did not show that the defendant was either stalking or attracting the two young girls into his car or that he was engaged in any improper or criminal conduct that can be described as highly similar to the conduct involved in the abduction of the victim in the instant offense. The similar acts are not so unusual and distinctive as to serve the purposes for which such evidence may be considered by the jury.

Justice BOYLE, joined by Chief Justice RILEY and Justice GRIFFIN, dissenting in part, would hold that *Frye v United States,* 54 App DC 46 (1923), should not be applied to exclude the testimony of a witness simply because the witness has been hypnotized. Rather, the dangers of hypnosis require that the

reliability of such testimony be established by clear and convincing evidence.

1. Where posthypnosis identification is otherwise shown to be reliable, there is no purpose in limiting identification evidence to facts related and recalled prior to hypnosis. In the context of posthypnosis identification particularly, the rule espoused by the majority sweeps too broadly, eliminating reliable and unreliable evidence alike. The more prudent balance should be struck by requiring a preliminary determination of admissibility case by case. The court should, pursuant to MRE 104, make a determination of the reliability of the evidence sought to be presented. If posthypnosis testimony is found sufficiently reliable for admission, the parties should remain free to make the jury aware of the dangers of hypnosis with expert testimony and to cross-examine the identifying witness with regard to the conditions of hypnosis and any independent basis for observation.

2. So analyzed, there is clear and convincing evidence of the reliability of the testimony in this case of all the hypnotized witnesses save one. While the trial court erred in admitting this testimony, it cannot be said that the error resulted in a miscarriage of justice. The record indicates that the identity of the defendant was unknown to the police officers at the time of the initial hypnosis, and, thus, it is indisputable that there was no connection between that hypnosis and the witnesses' later identification of the defendant. Additionally, the identification of the vehicle was reliable, as the defendant's expert witness testified, because it was identified by the witnesses before, during, and after hypnosis, and, thus, the hypnosis had no bearing on its identification. The defendant's ownership of the vehicle was corroborative of the reliability of the identification of the defendant. Finally, and most significantly, the defendant's expert also testified that the identification of the defendant was not the product of the hypnotic sessions.

The defendant's conviction should be affirmed.

CRIMINAL LAW — WITNESSES — HYPNOTICALLY INDUCED TESTIMONY — BURDEN OF PROOF.

The testimony of a hypnotized witness is inadmissible, absent proof by clear and convincing evidence that the testimony being offered was based on facts recalled and related prior to hypnosis.

*Frank J. Kelley*, Attorney General, *Louis J.*

*Caruso,* Solicitor General, *William A. Forsyth,* Prosecuting Attorney, and *Timothy K. McMorrow,* Chief, Appellate Division, for the people.

State Appellate Defender (by *Chari Grove* and *Charles J. Booker*) for the defendant.

BRICKLEY, J. Defendant, Albert Lee, III, was convicted of first-degree felony murder[1] and sentenced to life imprisonment. We granted leave to appeal limited to:

(1) Whether the testimony of witnesses who had been hypnotized was properly admitted; and

(2) Whether similar acts evidence was properly admitted.

We hold first that the rules of *People v Gonzales*[2] and *People v Nixon*[3] were violated and thus that it was error for the trial court to admit the identification testimony of the hypnotized witnesses. Second, the similarities between the charged crime and the similar acts testimony satisfies the standards of *People v Golochowicz,* 413 Mich 298; 319 NW2d 518 (1982).

I

Procedurally this case has a long history. Following his conviction, defendant moved for a new trial which was denied. Defendant appealed by right. The Court of Appeals held that the standards of *People v Gonzales,* 415 Mich 615; 329 NW2d 743 (1982), modified 417 Mich 968; 336 NW2d 751 (1983), dealing with hypnotized wit-

---

[1] MCL 750.316; MSA 28.548, kidnapping being the underlying felony.

[2] 415 Mich 615; 329 NW2d 743 (1982), modified 417 Mich 968; 336 NW2d 751 (1983).

[3] 421 Mich 79; 364 NW2d 593 (1984).

nesses were not satisfied.[4] However, the Court of Appeals held that because this case was decided before *Gonzales* its holding was inapplicable "but that reversal is nevertheless required in a pre-*Gonzales* case if defendant was prejudiced by admission of testimony as to recollections induced by hypnosis." Thereafter the Court found that the identification procedures were not "unnecessarily suggestive or conducive to irreparable misidentification," upholding the trial court's admission of the testimony of hypnotized witnesses.

Judge Maher dissented on the hypnosis issue. He concluded that on the basis of the factors pronounced by this Court in *People v Hampton,* 384 Mich 669; 187 NW2d 404 (1971), *People v Gonzales, supra,* should be applied retroactively.[5] Thus, he found that defendant was denied a fair trial because the eyewitness testimony was tainted by hypnosis.

Relative to the similar acts testimony, the Court of Appeals found that the facts were sufficiently substantial to justify admission to show identity. The Court held that the trial court did not abuse its discretion and that the evidence was not erroneously admitted.

A request for review was filed with this Court and it was held in abeyance pending release of another hypnosis case, *People v Nixon,* 421 Mich 79; 364 NW2d 593 (1984). Following the release of *Nixon,* the case was remanded to the Court of Appeals for reconsideration. On remand, the case was reaffirmed.[6] We granted leave to appeal. 429 Mich 885 (1987).

---

[4] *People v Lee,* unpublished opinion per curiam of the Court of Appeals, decided May 9, 1983 (Docket No. 51044).

[5] The law on hypnosis has been changed considerably since then and the basis on which Judge Maher dissented is no longer applicable.

[6] *People v Lee (On Remand),* unpublished opinion per curiam of the Court of Appeals, decided November 21, 1985 (Docket No. 85840).

II

The undisputed facts of this case are that an eleven-year-old Grand Rapids girl was abducted from her school safety patrol post on the morning of February 12, 1979. Later that same day her body was found near the Regency Park Apartments. The cause of death was strangulation.

The extensive investigation by police produced four categories of evidence: (1) eyewitness identifications, (2) physical evidence, (3) similar acts evidence, and (4) testimony of defendant's former cellmate which is not at issue in this appeal. The propriety of the similar acts evidence is discussed below. We therefore turn to a discussion of the eyewitness identification and the physical evidence.

A

There were seven key prosecution witnesses (Jack Hill, James Vos, Jack Vos, Greg Start, David Orr, Jr., Timothy Wilcome, and Jim Bonnema), all of whom were hypnotized. Moreover, five of the witnesses were hypnotized on two separate occasions by different hypnotists. The first hypnotic session was conducted by Mr. Robert Mazur, a local hypnotist, who operates the Grand Rapids Hypnotic Clinic. Mr. Mazur is not a psychiatrist or a psychologist and did not testify at trial. Dr. Donald Rossi of the Michigan Department of State Police conducted the second hypnotic sessions. Most of the hypnotic sessions were audiotaped but not videotaped. According to the experts who listened to the tapes, the hypnosis sessions themselves were conducted without any deliberate "attempt to alter [witnesses'] memories."

Police were notified of the incident by Jack Hill

who witnessed the last stages of the abduction. At
the intersection of the abduction, Jack Hill noticed
a car parked on the wrong side of the road and
stopped to offer assistance. He spoke to a black
man standing outside the vehicle and noticed a
young white girl in the back seat. As the black
man drove off Mr. Hill attempted to follow the car.
Mr. Hill described the car as a clean, shiny black
two-door. He originally told the police that he
thought the car might be a Chrysler; however, at
trial he testified that the car was a black Grand
Prix. The driver was described as a neatly dressed
black man with a neat haircut. Mr. Hill did not
notice any facial hair on the man.[7]

James Vos was driving his son, Jack Vos, to
school at the time of the abduction when he no-
ticed a black car skidding fast around a corner
towards his vehicle. Mr. Vos was stopped for traffic
when Mr. Hill informed them that he needed
assistance pursuing a vehicle because a young girl
had been abducted. James Vos described the car as
a clean black two-door hardtop Pontiac Grand Prix
with fancy wheel hubs and white walls. Mr. Vos
noticed a black man driving the car who was
approximately twenty-five to thirty years old,
clean in appearance, wearing a dark leather
jacket, and having an afro haircut moderate in
length. However, he was unable to clearly identify
the man driving the car. He did not notice anyone
in the car and, in fact, stated that his main
concentration was on the car and not on the
person driving the car. At trial he was confident

[7] A police officer testified that he stopped the defendant on Febru-
ary 12, 1979, and described defendant as having a mustache and
noticeable sideburns. The defense attempted to emphasize at trial
that none of the eyewitnesses remembered the perpetrator as having
facial hair or sideburns thus suggesting that defendant could not have
been the abductor. Additionally, the girls who testified about the
similar act do not recall the man having a mustache or sideburns.

about his testimony concerning the make and model of the car.

Like his father, Jack Vos observed the car as being a Grand Prix because of the insignia and the grill on the vehicle. He was confident about the description of the car. However, unlike his father, he did observe a small girl in the back seat. He testified that she was a white girl, with blond hair, wearing a blue hat and a green coat.

On the day of the incident, February 12, 1979, Jack Hill was taken to the police department where two composite drawings were made. The first composite drawing was made prior to Mr. Hill being hypnotized. A second composite was compiled during the hypnotic session with Mr. Mazur. Jack Hill, James Vos, and Jack Vos were also all hypnotized on February 12 by Mr. Mazur.

Greg Start, a school crossing guard, gave testimony that he had seen a black car with red pinstriping and a red interior drive by his patrol corner twice. He noticed the car a second time because the driver had run a stop sign. Greg's testimony was more specific in that he identified the car as a Grand Prix because he saw the letters on the front fender of the car. Further, he described the driver as a young black man with a mustache and an afro hair style.

The victim's knapsack was recovered from a dumpster at the Georgetown Condominiums by the rubbish collector sometime on the afternoon of February 12, 1979. The Georgetown Condominiums are located within one mile of where the victim's body was found. On the morning of February 12, a black car driven by a black man was lodged in a snowbank at the condominium. Two grounds maintenance men, David Orr, Jr., and Timothy Wilcome testified that they helped the man free his vehicle. Specifically, Mr. Wilcome

testified that a black man with neat hair (not an afro style), wearing a leather jacket walked up to the shed and asked for assistance to push his car out of a snowbank. Wilcome stated further that the black man smoked Kool cigarettes[8] and that the car looked like a black Monte Carlo.[9] Mr. Orr stated specifically that the car was a black Monte Carlo because of the emblem on the back of the car.[10] Also that the car had bicentennial license plates[11] and spoke-type wheels with curb feelers. Thereafter, Mr. Orr saw him get out of the car and throw something away in a nearby dumpster. Two days after the incident, February 14, 1979, Timothy Wilcome and David Orr, Jr., were hypnotized.

As the police continued to receive tips on the abductor, three mugbooks were compiled. Defendant's picture appeared in mugbooks one and two, however he was not pictured in the third mugbook. The first photo showing (mugbook one) occurred on February 15, 1979. Jack Hill, David Orr, Jr., James Vos, Jack Vos, and Timothy Wilcome participated, but no positive identification was made. In fact, each witness identified persons other than defendant as possessing features similar to the abductor.

Mr. Jim Bonnema notified the police about see-

[8] A police officer testified that during an investigatory interview with defendant, he smoked Kool cigarettes.

[9] During the investigation stage of this case, Mr. Wilcome told defendant's attorney that the vehicle he saw on the morning of February 12 could not have been a Pontiac Grand Prix.

[10] To free the car from the snow he had to attach a tow rope to the back of the vehicle.

[11] Defendant apparently got new license plates sometime during business hours on February 12, 1979. Testimony suggests that it was sometime before noon. However, we would note that this was not a spontaneous attempt on the part of defendant to "cover his tracks." In the week preceding the slaying, defendant had attempted to transfer title on the vehicle and obtain new license plates but was unable to complete the transaction.

ing the particular vehicle on the morning of February 12 after reading about the incident in the newspaper and seeing a story on television. He was hypnotized on February 16, 1979,[12] and while under hypnosis he gave a license plate number. However, he was unable to positively identify the driver of the vehicle.

On February 23, 1979, Jack Hill, Jack Vos, David Orr, Jr., and Timothy Wilcome were hypnotized for the second time by Dr. Donald Rossi. During the hypnotic session with Mr. Hill, a police artist was present who attempted to sketch a third composite drawing while Mr. Hill was under hypnosis. Following the hypnotic sessions each witness participated in a second photo showing (mugbook two). Mr. Orr identified defendant among others from this mugbook. Otherwise there was no positive identification by any other witness.

On February 26, 1979, defendant went to the police department for a polygraph examination,[13] at which time he agreed to participate in a corporal lineup. The participating witnesses were Jack Hill, Jack Vos, James Vos, David Orr, Jr., and Timothy Wilcome. Of these witnesses, only Timothy Wilcome picked defendant from the lineup; however, he could not make a positive identification.[14]

On March 15, 1979, mugbook three was shown

[12] The tape of Mr. Bonnema's hypnotic session was not available to defendant. It was apparently lost or erased during the investigation. However, defendant did receive a copy of the synopsis made after the session.

[13] Polygraph testing and the results were not introduced at trial. However, according to testimony given during the pretrial motions, defendant apparently failed the polygraph testing.

[14] Eight men participated in the lineup. All the men had their hair in cornrows, and thus defendant fixed his hair in a similar fashion. However, on the day of the incident, the perpetrator was described as having a neat, small to medium afro. As a result the participating witnesses claimed that identification was impossible because defendant was disguised.

to Hill, Orr, Wilcome, James Vos, and Jack Vos. The witnesses did not positively identify any person (defendant was not pictured). Mr. Wilcome is the only witness who did not pick anyone from these photographs.

Defendant participated in a second lineup on March 29, 1979. At this lineup the defendant was identified by Mr. Hill, Jack Vos, and Mr. Wilcome. Mr. Orr picked someone other than defendant from this lineup as being the alleged perpetrator. James Vos also participated in the lineup, but could not identify the perpetrator.

Two months later, on June 19, 1979, Greg Start was hypnotized by Dr. Rossi.[15] The next day he participated in a corporal lineup and picked defendant.[16]

Prior to the second lineup, March 29, 1979, one day prior to defendant's arrest, most witnesses at one time or another had made false identifications or at least identifications of persons other than defendant. Mr. Wilcome was the only witness who picked defendant from both lineups. However, he did not make a positive identification at either.

All of the in-court identifications of defendant, except by Jack Hill, were tentative. Mr. Hill made two in-court identifications of the defendant, the

---

[15] Greg Start is one of the few witnesses who admits at trial that he does think he was hypnotized. The audiotape of his hypnotic session with Dr. Rossi was played to the jury; however, it was not transcribed in the record. At trial, defendant's attorney cross-examined Greg Start as to various statements he made to Dr. Rossi during the hypnotic session. Relevant to the issue of identification, Greg Start made the following statements: "No, I didn't get a good look at him either time"; in response to Dr. Rossi's question "Did you see his face a little bit?" he answered, "A little bit"; in response to a question concerning whether or not Greg saw the car, he answered "Not too good, not at all"; he also stated, "I didn't pay much attention to him."

[16] This occurred after the arrest of defendant (March 30, 1979) and after pictures of the defendant appeared in the newspapers and on television.

first being at the preliminary examination and the second during trial. He was extremely confident about each in-court identification.

At trial, Jack Vos made an in-court identification of the defendant as the man he picked from the second lineup. However, he testified that, while defendant looked identical to the man, he could not identify defendant as the man he saw on February 12. Greg Start positively identified defendant as the man he picked from the lineup on June 20. However, this identification occurred after considerable publicity attendant to defendant's arrest,[17] and at trial he stated that he expected to see the suspect in the lineup.

Timothy Wilcome made an in-court identification of defendant as the person he selected from both lineups. At trial he testified that he was not confident in his identification of defendant but that he looked the closest to the person he saw on February 12. At the time of trial James Vos did not make an in-court identification. Rather, he testified that he could not state, one way or the other, whether defendant was the person driving the vehicle on the morning of February 12. Jim Bonnema was unable to positively identify the defendant at trial. However, he did state that there was nothing unusual about defendant to rule him out as the driver of the Grand Prix.

[17] Defendant filed two motions relative to the publicity surrounding the incident. First, defendant sought to have the proceedings closed on the basis of a balancing of the substantial amount of publicity and defendant's ability to obtain a fair trial. The trial court denied defendant's motion. The court found that the First Amendment rights of the press were a substantial interest in this case and that defendant could still receive a fair trial with an open courtroom. Second, defendant moved for a change of venue, consideration of which was reserved until the jury was selected. Defendant raised two grounds for his motion, (1) damaging media coverage, and (2) the emotional effect of the crime on potential jurors and the community. The court denied the motion, stating that an impartial jury had been empaneled.

## B

Our analysis on the issue of admissibility begins with two basic premises offered by the prosecution from the Rules of Evidence. First, all relevant evidence is admissible, absent prejudice, confusion, or waste of time. MRE 401, 402, 403. Second, all witnesses are presumed competent to testify. MRE 601, 602. The relevancy of an eyewitness identification is not questioned. Therefore our only concern is the admissibility of a witness' testimony after being subjected to hypnosis.

The test to be applied is derived from our holdings in *People v Gonzales* and *People v Nixon, supra.*[18] In *Gonzales,* we held that hypnotically induced testimony is inadmissible, but left open the question whether a hypnotized witness could testify regarding facts recalled and related prior to hypnosis. We answered the question in *People v Nixon,* holding that a witness may testify regarding facts " 'demonstrably recalled prior to hypnosis.' " The burden is on the party offering the testimony of a hypnotized witness to "establish its reliability by clear and convincing evidence." *Nixon, supra* at 90. The clear and convincing standard adopted in *Nixon* does not, as the dissent would suggest, extend to the question whether any posthypnotic testimony is reliable.[19] Rather, testimony of a hypnotized witness is reliable only when

[18] In *People v Nixon,* we rejected the defendant's arguments that a witness was totally incompetent because of being placed under hypnosis relying on the holding of the Arizona Supreme Court in *State ex rel Collins v Superior Court,* 132 Ariz 180; 644 P2d 1266 (1982), and the New York decision of *People v Hughes,* 59 NY2d 523; 453 NE2d 484 (1983). For a summary of the development of the law on hypnosis in other jurisdictions, see *People v Gonzales* and *People v Nixon.*

[19] The dissent justified our holding in *Nixon* concerning the admissibility of posthypnotic testimony by labeling it as a "heightened reliability standard" which would require "that reliability must be shown by clear and convincing evidence." (*Post,* p 108, BOYLE, J., dissenting.)

the clear and convincing evidence offered by the
proponent of the testimony demonstrates that the
witness is testifying only with regard to those facts
which were recalled and related prior to hypnosis.

Further, in *Nixon* we reaffirmed our position,
quoting with approval the following language from
*Gonzales:*

> "The process of hypnosis is not a reliable means
> of accurately *restoring forgotten incidents or re-
> pressed memory,* and to permit posthypnotic testi-
> mony would unfairly denigrate the defendant's
> right to cross-examination. Therefore, we hold that
> until hypnosis gains general acceptance in the
> fields of medicine and psychiatry as a method by
> which memories are accurately improved without
> undue danger of distortion, delusion or fantasy,
> and until the barriers which hypnosis raises to
> effective cross-examination are somehow overcome,
> the testimony of witnesses *which has been tainted
> by hypnosis* must be excluded in criminal cases."
> [*People v Nixon, supra* at 88, quoting *People v
> Gonzales, supra* at 626-627. Emphasis in original.]

The dissent advances that this Court erred in
*Nixon* by applying the *Davis/Frye* test to hypno-
sis.[20] However, hypnosis is a scientific procedure
which renders a subject susceptible to external
influences which could distort the memory.[21] "[S]ci-
entific understanding of the phenomenon and of
the means to control the effects of hypnosis is still

---

[20] We note that the parties in this case did not raise or argue on
appeal the applicability of the *Davis/Frye* doctrine to the hypnotic
process. *People v Davis,* 343 Mich 348; 72 NW2d 269 (1955); *Frye v
United States,* 54 App DC 46; 293 F 1013 (1923).

[21] See, generally, Scholder, *The argument against use of hypnosis to
improve or enhance the memory of courtroom witnesses,* 7 Law &
Psychology R 71 (1982); Curato, Plifka & Schroeder, *Recent decision:
Evidence: Hypnotically enhanced testimony—A question of admissibil-
ity or credibility for criminal courts?* 58 Notre Dame L R 101 (1982);
comment, *Hypnosis—Should the courts snap out of it?—A closer look
at the critical issues,* 44 Ohio State L J 1053 (1983).

in its infancy."[22] "[N]o expert can determine whether memory retrieved by hypnosis, or any part of that memory, is truth, falsehood, or confabulation . . . . Such results are not scientifically reliable as accurate."[23] Accordingly, we can find no justifiable reason for overturning clear precedent established in this state.[24]

Defendant argues that the procedures established by this Court in *People v Nixon,* were not followed, so corrupting the identification process by the suggestive effect of hypnosis as to deny defendant his right to a fair trial. The prosecutor admits that the hypnotic sessions were not conducted in light of the safeguard procedures adopted by the Court in *People v Nixon.*[25] However, the prosecutor asserts that under a totality of the circumstances, the testimony of each eyewitness was not tainted by hypnosis and, in fact, was based on prehypnotic recollection. We disagree

---

[22] *Rock v Arkansas,* 483 US 44, 61; 107 S Ct 2704; 97 L Ed 2d 37 (1987).

[23] *State v Mack,* 292 NW2d 764, 768 (Minn, 1980).

[24] Defendant's expert, Dr. Martin T. Orne, whose testimony the dissent relied upon in its finding of reliability and admissibility of posthypnotic testimony stated that hypnosis, although a valid investigatory tool, should not be used as a means by which to get an accurate eyewitness account of an event for testimonial purposes. He cautions against such use because it is virtually impossible to separate an actual memory from that created while in a hypnotic state. Dr. Orne is a renowned expert in the area of hypnosis and hypnotically refreshed memory.

[25] We note that the safeguards announced by Dr. Orne and adopted by the dissent in formulating a new test were not adhered to in this case. (See *post,* p 110, BOYLE, J., dissenting). First, the initial hypnotic sessions of six of the seven hypnotized witnesses were conducted by Mr. Robert Mazur, a local hypnotist. Mr. Mazur is not a psychiatrist or psychologist. Second, Dr. Donald Rossi, who conducted the second hypnotic sessions, although a psychologist, is not independent of the state. Third, neither hypnotist extracted from the subjects a prehypnosis description of the events. Fourth, all contacts between the hypnotist and the subject were not preserved for review by a recording. Finally, outside third parties were present during the hypnotic sessions.

that such an approach is allowable under the precedent of *Gonzales* and *Nixon.*

The investigation in this case took place before *Gonzales* was decided. In *Nixon,* we ruled with regard to the application of *Gonzales,* holding that the principles set forth therein are not to be applied retroactively but are applicable to all cases tried after its release and to those pending on appeal where the hypnosis issue is preserved. Defendant's case was pending on appeal when *Gonzales* was released, and the hypnosis issue was properly preserved. Thus defendant is entitled to application of *Gonzales.*

Although the rules enumerated in *Gonzales* and *Nixon* are applicable, factually the two cases differ from this case because neither involved a posthypnotic lineup identification. The only case we have dealt with involving posthypnotic lineup identification was *People v Centers,* 422 Mich 951 (1986). We addressed the issue of admissibility of a witness' testimony after submitting to hypnosis to resolve a conflict in the Court of Appeals. See *People v Centers,* 141 Mich App 364; 367 NW2d 397 (1985), and *People v McIntosh,* 142 Mich App 314; 370 NW2d 337 (1985).[26]

Centers and McIntosh were tried together, and

---

[26] In a footnote, the *McIntosh* panel recognized that a conflict existed between its holding and the holding in *People v Centers.*

We recognize that the panel in *People v Centers, supra,* concluded that admission of evidence in Faulkner's identification of suspects at the posthypnotic lineup was reversible error because the actual *identification* was not something recalled and related prior to hypnosis. We are unable to agree with this conclusion because we understand *Nixon* to permit trial testimony which is based on facts recalled and related prior to hypnosis even if the statement (including identification) was obtained after hypnosis. We base this analysis on the *Nixon* Court's statement in footnote 3 that "[s]tatements obtained *after* hypnosis are inadmissible per se under *Gonzales,* except as otherwise stated in this opinion and in accordance with applicable evidentiary rules." 421 Mich 91. In this case, we

both were convicted of murder and armed robbery. Following an evidentiary hearing, the trial court allowed testimony concerning the identification of the suspect made at a posthypnotic lineup. The lineup occurred eight months after the hypnotic session. Prior to hypnosis, the witness gave police a description of the suspect on two occasions. During the hypnotic session, the witness gave basically an identical description of the suspect. The hypnotic session was tape recorded and transcribed, as well as reviewed by the court during the evidentiary hearing.[27] The trial court reached its decision to allow the testimony by comparing the descriptions made by the witness pre- and posthypnosis. On appeal, both defendants argued that the trial court erred in admitting testimony of an eyewitness who had been hypnotized during the police investigation.

The Court of Appeals in *Centers* ruled that identification of a suspect at a corporal lineup by a witness who had been hypnotized was error requiring reversal. The Court found significant the fact that identity was central to the issue at trial, so that the testimony of the witness regarding identi-

----

find, as did the trial court, that Faulkner's tentative identification of defendant at the posthypnotic lineup was based solely on facts recalled and related by her prior to hypnosis. Her in-court testimony about this identification was, therefore, solely based on facts recalled and related prior to hypnosis. [142 Mich App 321-322, n 5. Emphasis in original.]

[27] In a footnote, the *Nixon* Court ruled as to the admissibility of tape recordings of the hypnotic sessions. The Court stated:

The trial court correctly ruled that statements made during hypnosis are inadmissible to prove the truth of the matters asserted therein . . . . Given the inherent problems of investigative hypnosis, we also hold that statements obtained from a witness during hypnosis cannot be used to bolster or impeach the witness' credibility. [*Nixon, supra* at 91, n 3. Citations omitted.]

fication of the defendant was not harmless error.
The Court remanded the case to the circuit court
holding that

> the circuit court shall not admit any posthypnotic
> testimony or testimony concerning posthypnotic
> statements unless it is demonstrated that the testi-
> mony is based solely on facts recalled and related
> by the witness or declarant prior to hypnosis and
> the party offering the testimony establishes its
> reliability by clear and convincing evidence. [*Cen-
> ters, supra* at 371.]

Contrary to the holding in *Centers,* the *McIntosh*
panel found that because of the similarity in the
witness' descriptions of the suspect, both pre- and
posthypnosis, the identification at the lineup was
based on facts recalled and related prior to the
hypnotic session.

In lieu of granting leave to appeal, we vacated
the decision in *People v Centers* and affirmed the
decision of *People v McIntosh,* 422 Mich 951
(1986). Justice LEVIN dissented, stating that the
prosecutor had failed to establish by clear and
convincing evidence that the witness was recalling
facts related prior to the hypnotic session.

In *McIntosh* and *Centers,* testimony from the
eyewitness was admitted on the basis of a compar-
ative analysis of the information given during
hypnosis and the prehypnotic statements. Because
the information was substantially the same, the
Court found that the identification was based on
information recalled and related prior to hypnosis.
However, in this case, we cannot make such an
analysis. We do not have prehypnotic statements
from the witnesses, nor an identification of the
defendant prior to the hypnotic sessions.

It is obvious in this case that the police depart-
ment was in a most difficult investigative posture,

knowing as they did that an eleven-year-old girl had been abducted and that she, and possibly other potential victims, were in serious jeopardy. Thus, they devoted their efforts to extract every conceivable bit of information from the witnesses as quickly, and as thoroughly, as possible. The dissent suggests that under the rule adopted in Michigan the state must "choose between use of hypnosis during the investigative stage and the potential loss of a witness' testimony at trial . . . ." (*Post,* p 108, BOYLE, J., dissenting.) However, the use of hypnosis as an investigatory tool is not foreclosed by today's decision. The error in this case resulted from the fact that the investigation was conducted with little or no thought to the preservation of evidence for testimonial purposes. It is admitted that there was virtually no attempt to establish a record of the prehypnotic state of mind of each witness.

Three witnesses were hypnotized on the day of the abduction, and three other witnesses were hypnotized two days after the incident. Furthermore, five of the seven key prosecution witnesses were hypnotized twice. This further complicates and accentuates the inherent difficulties that are present in even a single hypnotism of a witness and that have already led us to exclude hypnotically induced testimony. The administration of hypnosis to the witnesses was interspersed among the photographic and corporal lineups, making it nearly impossible to track the purported state of each witness' memory, even if such evidence were available.

The prosecution argues and the defense experts agree that the hypnotic sessions were conducted without any deliberate attempt to alter witnesses' memories. However, even if, as proposed by the dissent, nonsuggestiveness eliminates the unrelia-

bility of posthypnotic testimony, the fact that the
police originally did not have a suspect toward
whom the interrogator could possibly nudge an
uncertain witness, there undoubtedly was in this
case, and understandably so, a strong desire to
have an identification made.[28] While the dissent
suggests we "ignored" the lack of a suspect at the
time of the "initial" hypnosis, the dissent ignores
the fact that Mr. Wilcome was the only witness to
identify defendant from the first lineup. The
identification of defendant by Mr. Wilcome during
the first lineup was not positive. Mr. Wilcome
initially did not identify any individual, but rather
as an afterthought picked the defendant as the
man who looked the closest to the perpetrator.
Further, defendant was a primary suspect[29] at the

[28] The hypnotic state is a condition of altered consciousness
marked by heightened suggestibility. A subject in a hypnotic
state may not have accurate recall. A hypnotized subject is
highly susceptible to suggestion, even that which is subtle and
unintended. Such suggestion may be transmitted either during
the hypnotic session or before it . . . . The person under
hypnosis experiences a compelling desire to please either the
hypnotist or others who have asked the person hypnotized to
remember or who have urged that it is important that he or
she remember certain events. The subject may produce the
particular responses he believes are expected of him. In this
state of hypersuggestibility and hypercompliance the subject
will unconsciously create answers to the questions which the
hypnotist asks if he cannot recount the details being sought.
This process of filling the gaps of memory with fantasy is called
confabulation. Neither the person hypnotized nor the expert
observer can distinguish between confabulation and accurate
recall in any particular instance. [*Gonzales, supra,* pp 623-624.]

[29] The Grand Rapids Police Department received two tips concern-
ing defendant. Defendant was first contacted by police on February
16, 1979. Defendant was again contacted one week later to clarify
discrepancies in the statements he gave to police concerning his
whereabouts on the day of the incident. This is the same day that the
second hypnotic sessions were conducted. It was at this time that
arrangements were made for polygraph testing. Only six to eight
other individual suspects were contacted on more than one occasion
by police and only one other suspect took a polygraph exam. Defen-
dant was the focus of the police investigation on February 23, 1979.

time of the second hypnosis which occurred one month prior to the identification of the defendant at the second lineup. The second hypnotic session took place after police had an opportunity to verify defendant's alibi statement which resulted in discrepancies in times and places.

The prosecutor further argues that because there was a uniformity of reactions by all the witnesses at the lineups, the identifications were based on prehypnotic memory. We disagree; first, because even though each witness gave a general description of a black man prior to hypnosis, it was not until after the hypnotic sessions that the witnesses were given the opportunity to select or reject the defendant. Furthermore, each witness at one time or another identified persons other than defendant as the perpetrator. Lastly, there is no record of the prehypnotic descriptions of the perpetrator available upon which to make a comparison, as we did in *Centers* and *McIntosh,* to support the admission of identification testimony by the hypnotized witnesses.

Further, the plaintiff did not argue, nor can we conclude, that the prehypnosis composite drawing by witness Jack Hill can be considered a statement recalled and related under *Nixon.* The composite drawing represents the work of the artist and cannot substitute for oral testimony related and recorded.

The dissent also claims that the uniformity among witnesses of the identification of the vehicle driven by the abductor supports the conclusion that the identification was reliable. The record, however, paints a fuller picture. Jack Hill, the man who witnessed the last stages of the abduction, initially and while under hypnosis identified

the vehicle as a shiny, black Chrysler.[30] Subsequent to both hypnotic sessions Mr. Hill saw de-

[30] On cross-examination Mr. Hill gave the following testimony:

*Q.* As you approached the car, did you see the front of the car, the grill, any name brand markings?
*A.* No, sir.
*Q.* In fact, Mr. Hill, wasn't it your belief on February 12 that the car was a Chrysler?
*A.* I—I assume I thought it was. I wasn't sure.
*Q.* Do you remember telling Mr. Mazur on February 12 that it was a shiny, black Chrysler?
*A.* Yes.
*Q.* Do you remember telling Mr. Mazur on February 12, the night of this incident, "I'm damn sure it was a Chrysler"?
*A.* I assumed it was, yes.
*Q.* Do you remember telling the police, the first statement on February 15, that it was a black Chrysler?
*A.* I thought it was.
*Q.* My question is: Do you remember telling them that?
*A.* Yes.
*Q.* Do you remember telling them, also, that it was black and you were sure it was a Chrysler?
*A.* Yes, sir.
*Q.* Do you remember telling Dr. Rossi on February 23 that you remember seeing on the chrome on the top of the grill, "I'm sure it said Chrysler there. Letters staggered. I didn't see all of Chrysler—Chrysler, but spelled something similar to Chrysler."
*A.* I think I did.
*Q.* But, now, you don't think you did?
*A.* Yes, I believe I told him that.
*Q.* What about now?
*A.* I know it's not.
*Q.* Why do you know it's not?
*A.* I just know it wasn't a Chrysler.
*Q.* You know it is not because Mr. Lee does not have a Chrysler, is that true?
*A.* No, sir. I just assumed it was. I told them I wasn't positive. It was a black, shiny car.
*Q.* But you weren't positive . . .
*A.* That it was a Chrysler, no. Never was.
*Q.* Your statement "damn sure it was a Chrysler," to you is not being positive?
*A.* (No response)
*Q.* Pardon?
*A.* At times I thought it was a Chrysler. I admit that.

fendant's vehicle in the police garage and thereafter testified at trial that the vehicle was not a Chrysler.[31] Further, David Orr and Timothy Wilcome, the grounds maintenance men who freed a black car from a snowbank near where the victim's body was found, both testified that the car was a black Monte Carlo.[32] The dissent states that "Orr did identify the car as a black Monte Carlo" but discounts the inconsistency in its analysis by suggesting that the purpose of Orr's testimony was merely corroborative. The procedures employed in this case were totally lacking in safeguards to ensure the reliability of the testimony being offered.[33] The standards and analysis employed by

[31] Memory hardening and confabulation as a result of suggestion from external sources are dangers inherent in the hypnotic process.

[32] Mr. Wilcome testified:

> *Q.* And the car you saw in your view was a Monte Carlo?
> *A.* Yes.
>
> * * *
>
> *Q.* Do you remember telling me [defendant's attorney] at that time the car you saw could not have been a Grand Prix?
> *A.* Yes.
> *Q.* Is that your view today?
> *A.* Yes.

Mr. Orr testified:

> *Q.* Now, the car that you helped tow on February 12, did you touch that car with your hands?
> *A.* Yes.
>
> * * *
>
> *Q.* The car you saw was a Monte Carlo?
> *A.* Yes.
> *Q.* You remember seeing the emblem on the back saying that it was a Monte Carlo?
> *A.* Yes.

[33] We recognize that the standards adopted by this Court in *Gonzales* and *Nixon,* as to the admissibility of testimony from a hypnotized witness, were not available at the time of this investigation. However, the issue had been addressed by the Court of Appeals in

the dissent[34] suggest that reliability of post-
hypnotic memory can be tested on the basis of the
other independent evidence offered in the case.
However, this Court has never proposed that the
proper test for admissibility of evidence should be
based on the strength of the case against a defen-
dant. If there is enough independent evidence to
prove identity, there would be no need to intro-
duce unreliable evidence of identification. Merely
because the other evidence offered in the case
corroborates defendant's guilt or innocence does
not mean that it confirms the reliability of a
hypnotized witness' identification of defendant. To
establish the reliability of testimony offered by a
hypnotized witness would require an evaluation of
evidence that would suggest that the memory
produced from hypnosis was actual memory and
not merely evidence which would further corrobo-
rate defendant's guilt or innocence.

The dissent relies on testimony from Dr. Orne to
support its conclusion that the testimony received
from the hypnotized witness was reliable.[35] At
trial, Dr. Orne was allowed to comment about the
nature of the physical evidence presented and
whether, in his opinion, it corroborated the hyp-
notized witness' testimony. We note first that such
an evaluation is beyond the expertise of Dr. Orne

*People v Hangsleben,* 86 Mich App 718; 273 NW2d 539 (1978). In
*Hangsleben,* the Court did not allow the testimony of a psychiatrist
who was willing to testify that defendant claimed innocence while
under hypnosis. The Court held that defendant had failed to demon-
strate the general theory that hypnotically induced memory had
achieved general scientific acceptance.

[34] The dissent finds "preferable" and has incorporated into its rule
the safeguards of the "reliability centered approach . . . articulated
in *State v Hurd,* 86 NJ 525, 538; 432 A2d 86 (1981) . . . ." (*Post,* p
109, BOYLE, J., dissenting.) However, in *Gonzales, supra,* pp 624-625,
this Court specifically considered and rejected the *Hurd* standards as
insufficient to guard against the dangers inherent in the hypnotic
process. (See n 24.)

[35] See n 24.

and should not have been permitted. Further, the physical evidence served only to circumstantially support defendant's guilt and did not operate to afford a basis for distinguishing between what was the witness' actual memory and what was confabulation.

The dissent has, in our view, mischaracterized the work of this Court in *Gonzales.* In that case, we unmistakably expressed the view that posthypnotic testimony was "inherently unreliable." *Gonzales, supra,* p 626. However, we recognize that hypnosis does not always produce unreliable information, and in some cases the technique may have no effect on memory.[36] But because the science of hypnosis itself cannot aid us in distinguishing which effect is being achieved in individual cases, we have and should continue to consider as unreliable all posthypnotic testimony that is not recalled and related prior to hypnosis.

The purpose of the *Davis/Frye* doctrine is to determine if the scientific technique as a general rule produces reliable evidence. We cannot agree with the dissent that reliability can be determined in every case. The tenet that the trial judge can make a determination in each individual case and place the stamp of reliability and credibility on a hypnotized witness' testimony is without merit. The dissent today would scrap the *Davis/Frye* decision of *Gonzales* that

> [w]e agree with the conclusion that the process of hypnosis and its outcome is inherently unreliable. Hypnosis has not received sufficient general acceptance in the scientific community to give reasonable assurance that the results produced *under even the best of circumstances* will be sufficiently reliable to outweigh the risks of abuse or prejudice [*Gonzales, supra,* p 626 (emphasis supplied),]

---

[36] See, generally, *Rock,* n 22 *supra* at 59-61.

and put the trial courts in the position of determining on an ad hoc basis when hypnotically induced testimony is reliable and, therefore, admissible. This Court has over the years not deviated from application of the *Davis/Frye* doctrine to new scientific discoveries. The best way to achieve reliability of the results of scientific principles is to only allow admissibility of the results when the technique has gained general acceptance within the recognized field.

In a further attempt to recast *Nixon* from a rule that posthypnotic testimony is inherently unreliable into a rule that the trial courts can determine whether or not hypnotically induced testimony is reliable, the dissent states that "[w]hile we did say in *Nixon* that a witness could testify on the basis of facts recalled and related prior to hypnosis, we did not say that this was the only way" that you could establish its reliability. (*Post,* p 105, BOYLE, J., dissenting.) First, the "recalled and related" rule did not make posthypnotic testimony reliable. Rather, because posthypnotic testimony is so unreliable, the rule ensures that a hypnotized witness only testifies with regard to prehypnotic memory if the facts from that prehypnotic memory were recalled and related prior to the hypnosis. If there is any doubt about what we said on that point in *Nixon,* it should be resolved by the very language of the *Nixon* opinion.

> In order to ensure that the witness' trial testimony is based *solely* on facts recalled and related prior to hypnosis, we hold that the party offering the testimony must establish its reliability by clear and convincing evidence. [*Nixon, supra,* p 90. Emphasis supplied.]

*Nixon* did not, as the dissent advocates, establish a "heightened reliability standard" for hypnotically

affected testimony. (*Post,* p 108, Boyle, J., dissenting.) To the contrary, it established a reliability and burden threshold for testimony supported by prehypnotic actions.

We adhere to the standards adopted by this Court in *Gonzales* and *Nixon,* and hold that testimony of the hypnotized witnesses is inadmissible absent proof by clear and convincing evidence that the testimony being offered was based on facts recalled and related prior to hypnosis.

C

Where the reviewing court finds that evidence was improperly admitted it must also make a determination regarding whether the error was harmless. As defined by the court rules, "[a]n error in the admission . . . of evidence . . . is not ground for granting a new trial . . . unless refusal to take this action appears to the court inconsistent with substantial justice." MCR 2.613(A). The prosecution asserts that the physical evidence corroborates the eyewitness identification and therefore that any error in the admission of testimony from the hypnotized witnesses was harmless.

Justice Levin, writing for the Court, in *People v Young (After Remand),* 425 Mich 470, 505; 391 NW2d 270 (1986), defined the standards for determining if an error is harmless.

> As an appellate court, we do not independently evaluate this evidence. "[I]t is not the appellate court's function to determine guilt or innocence. . . . Those judgments are exclusively for the jury . . . ." Our responsibility is to determine how the error might have affected the jury's decision. The inquiry is "what effect the error had or reasonably may be taken to have had upon the jury's decision."

> If it were clear that the erroneous admission of
> the . . . evidence did not prejudice [the defendant],
> the error would be harmless. [Citing *Kotteakos v
> United States,* 328 US 750, 763-764; 66 S Ct 1239;
> 90 L Ed 1557 (1946).]

The error in the instant case was prejudicial to
defendant. Defendant was identified as the perpe-
trator of the crime only by witnesses who were
hypnotized. The jury was apprised of the fact that
the key witnesses for the prosecution were hypno-
tized, and we do not know what significance it had
in their determination of defendant's guilt. Fur-
thermore, absent the testimony of the hypnotized
witnesses, the remaining evidence does not posi-
tively link defendant to this crime. Thus we can-
not conclude that the evidence against defendant
was overwhelming.

The dissent criticizes our conclusion that the
error in this case was not harmless for two rea-
sons. The first is because of the "wholesale applica-
tion of *Nixon* to all the witnesses who were hypno-
tized . . . ." (*Post,* p 105, BOYLE, J., dissenting.)
However, by accepting the rule as set forth in
*Nixon* as clear precedent in this state, there is no
need to separate and examine individually each
witness' testimony. The dissent's analysis and
charge that we have "fail[ed] to engage in any
meaningful separate analysis of the testimony of
each witness" (*post,* p 104, BOYLE, J., dissenting) is
the best fortification of our decisions in *Gonzales*
and *Nixon* that all posthypnotic testimony which
is not based on prehypnotic memory recalled and
related is unreliable.

The second is that we have "[i]nexplicably ig-
nored . . . the fact that the defendant admitted to
a cellmate that he 'accidentally' killed the victim
while attempting to sexually molest her." (*Post,* p

105, BOYLE, J., dissenting.) We note first that the cellmate stated on the record that the only reason he contacted police with any information concerning defendant's purported confession was because he found the crime "sickening." Yet, at the time of trial, the cellmate had pending against him two counts of criminal sexual conduct in the first degree. Further he testified that he received no promises from the state in exchange for his testimony. One month after defendant's trial the cellmate entered into a plea bargain agreement where these charges were reduced to CSC IV, a misdemeanor. Additionally, defendant testified that he observed his cellmate reading documents pertaining to his case prior to testifying.

The evidence that was particularly incriminating to the defendant was that he was one of three black men in Kent County who owned a 1976 or 1977 black Grand Prix with a red interior.[37] Evidence found on the victim's body at the time of the autopsy included a number of short black Negroid hairs and reddish-orange carpet fibers, the source being unidentifiable. Additionally, a barrette was combed out of the victim's hair. When the police searched defendant's car, they found several long blond hairs and feathers that allegedly came from the victim's down mittens. Additionally, under the seat, police found a plastic barrette. The barrette found in defendant's car and the one combed from the victim's hair were manufactured by the same

[37] The witnesses' identification of the vehicle varied regarding whether it was a 1976 or 1977 Grand Prix or Monte Carlo. The police received a list from General Motors of the vehicle identification numbers of all 1976 and 1977 black Pontiac Grand Prixs with "firethorne red carpet." Over five thousand vehicles were manufactured during the two-year period. Three hundred thirty-four vehicles were titled in Michigan, of which twelve were in Kent County. Of the twelve titled in Kent County, three were owned by a black person, one of whom was the defendant. The police did not obtain statistics on Monte Carlos manufactured during 1976 and 1977.

company, although the manufacturer could not
state specifically that the barrette came from the
same package as the barrette found in the victim's
hair.

The prosecution brought in various expert wit-
nesses to testify as to the similarities between the
physical evidence found on the victim and in
defendant's car. However, these experts could not
positively state that the evidence comparatively
matched that produced from defendant's car. As a
result of the experts' testimony, the trial judge
stated:

> As I understand it, Mr. Murray [defendant's
> attorney] objects to Exhibits 139 through 144[38]
> because they apparently have no probative value
> other than to show what the authorities have done
> in an attempt to investigate this matter, and I
> suppose to head off any defense argument that
> they didn't do enough.
>
> \*   \*   \*
>
> But, really, I have been surprised I haven't
> heard this argument a long time ago. I have been
> listening to this type of testimony for two days,
> now. It is really just a failure to link the Defen-
> dant with any of the evidence.

The dissent described the trial judge who ex-
pressed these doubts as "a scrupulously fair judge"
(*post,* p 106, BOYLE, J., dissenting). We agree.

Although the totality of the evidence makes for
a stronger circumstantial case, the physical evi-
dence was not overwhelming, even though circum-
stantially significant. It has a limited probative
value, absent the eyewitness identification of de-

---

[38] Exhibits 139 through 144 consisted of hair fragments described as
being of Negroid origin that were found on the victim's body and
clothing. Additionally Exhibit 142 also contained several orange fibers
found on the gag.

fendant, and therefore we cannot conclude that all reasonable doubts would have been eliminated in the jurors' minds.

### III

We now turn to the question whether the similar acts evidence offered by the prosecution was properly admitted.

### A

The prosecution was allowed to admit the testimony of ten-year-old Judy Sanchez and nine-year-old Amy Combs over objection. The trial court endorsed the witnesses pursuant to MRE 403 and 404. They testified that on February 6, 1979, approximately one week prior to this incident, a black man in a black car approached them while they were walking to school. Defendant did not work on February 6, 1979. He called in sick and claimed to have been home all day.

The testimony of the two girls varies somewhat, although they generally testified that the man stopped his car and put one foot outside the door. He asked them for the time and the location of Hall Street. The girls responded to the questions, and after doing so the man motioned to the girls to come closer to the car. Both girls testified that they were scared and that the man recognized their fear. Judy had apparently run from the car, but Amy had stayed longer. As Judy gradually came back, the girls testified that the man got into the car and left.

The two girls identified defendant from a mugbook consisting of six photographs.[39] Both girls

[39] Amy Combs on her first viewing of the book identified someone other than Albert Lee. However, she was asked by the police officers

identified defendant in a corporal lineup on March
29, 1979. While participating in the corporal
lineup on March 29, Judy Sanchez identified two
persons, one being the defendant and a second
individual whose voice she felt sounded closest to
the person. At trial neither of the two girls were
able to positively identify the defendant as the
man who approached them on February 6, 1979.
On cross-examination Judy Sanchez made the fol-
lowing statement concerning the in-court identifi-
cation of defendant:

> *Q.* Judy, you are not saying that this man, here,
> Mr. Lee, Albert Lee, is the man you saw on that
> particular date, are you?
> *A.* No, it [sic] looks the closest description to the
> guy.

Amy Combs testified that she was "pretty sure,
but not positive" that Mr. Albert Lee was the man
who approached her and Judy.

### B

The introduction of similar acts evidence is an
exception to the general rule that evidence of
other crimes is inadmissible.[40] In order to be ad-
missible, the prosecution must show a high degree

to go through the book a second time more carefully and thoroughly.
Following her second viewing of this picture book she did identify
defendant as the man who had approached them on February 6. At
trial she stated that on the first viewing she did not pick defendant
because of the mustache he had in the picture.

[40] Prior to the introduction of the similar acts testimony the trial
judge gave the following instruction:

> You are the sole judges of whether to believe any such
> testimony. However, should you believe such evidence, you are
> cautioned that it is before you for a limited purpose. That is,
> for the purpose of determining if it tends to show the identity
> of the assailant of [the victim] on February 12, 1979.
> This evidence must not be considered by you for any other

of similarity between the charged and uncharged acts. These standards are to be strictly applied and have been narrowly defined by this Court in an attempt to safeguard the defendant's right to a fair trial. The policy considerations underlying the safeguards are an attempt to avoid convicting the defendant because of prior misconduct rather than on the proofs of the charged offense. The standards governing the admissibility of similar acts testimony were set forth by this Court in *People v Golochowicz,* 413 Mich 298, 309; 319 NW2d 518 (1982).

> [B]efore evidence of defendant's other misconduct may be admitted: (1) there must be substantial evidence that the defendant actually perpetrated the bad act sought to be introduced; (2) there must be some special quality or circumstance of the bad act tending to prove the defendant's identity or the motive, intent, absence of mistake or accident, scheme, plan or system in doing the act and, in light of the slightly different language of MRE 404(b) we add, opportunity, preparation and knowledge; (3) one or more of these factors must be material to the determination of the defendant's guilt of the charged offense; and (4) the probative value of the evidence sought to be introduced must not be substantially outweighed by the danger of unfair prejudice.

The two girls testified that it was a black man in a black car that approached them on their way to school. That alone probably does not constitute substantial evidence to show that it was defendant who committed the bad act. However, there was testimony that defendant is one of three black

---

purpose. You must not, for instance, regard this evidence as showing that the Defendant is a person of bad character or that he has the disposition to commit crimes. You must not convict the Defendant because you believe he is guilty of some other improper conduct.

men in Kent County who owns a black Pontiac Grand Prix, and, that defendant was absent from work on February 6, 1979, and could not verify his whereabouts.

The facts which weigh against the substantiality of the evidence include defendant's own testimony that he was not the man, and, additionally, the tentativeness of the girls' identifications. Further, one of the girls testified that the man did not have a mustache. Defendant had a mustache and noticeable sideburns a week later on February 12, 1979.

Although the identification of defendant was tentative, the identification is bolstered because two witnesses identified defendant. This alone would not constitute substantial evidence. However, the identifications, coupled with the fact that the man had a black car and that defendant drives a black car, as well as the fact that defendant did not go to work on February 6, leads us to conclude that the prosecution has shown by substantial evidence that defendant was the perpetrator of the similar act.

To test whether there is a special quality or circumstance sufficient to justify admission of the evidence on the issue of identity, this Court has made the following statements:

> It is the distinguishing characteristics which constitute the acts as similar within the meaning of . . . MRE 404(b), not the fact that all constitute the same crime or are violative of the same statute. The distinguishing, peculiar or special characteristics which are common to the acts and thus personalize them are said to be the defendant's "signature" which identifies him as the perpetrator . . . . [*People v Major,* 407 Mich 394, 398-399; 285 NW2d 660 (1979).]

> Where . . . the only conceivable justification for

admission of such similar-acts evidence is to prove the identity of the perpetrator, the link is forged with sufficient strength to justify admission of evidence of the separate offense only where the circumstances and manner in which the two crimes were committed are "[s]o nearly identical in method as to earmark [the charged offense] as the handiwork of the accused. Here much more is demanded than the mere repeated commission of crimes of the same class . . . . The [commonality of circumstances] must be so unusual and distinctive as to be like a signature. . . ."

It is because of the combined value of those two factors, the unique and uncommonly distinctive style employed by the defendant in committing the "substantially proved" uncharged similar offense, and the same distinctive *modus operandi* employed in the charged offense, that the jury is permitted to infer, if it believes the evidence, that both crimes were the handiwork of the same person, the defendant.

. . . It is the uniqueness and the distinctiveness with which both crimes were committed, combined with the proof that the defendant committed the "like act," that is the key. [*People v Golochowicz, supra* at 310-312. Citations omitted.]

The similarity between the two incidents upon which the prosecutor bases its admission are that (1) both incidents involved a black man driving a black car, (2) each occurred in the early morning hours when children would be walking to school, (3) both incidents involved young girls, and (4) both occurred in the same general area. Generally, it could be argued that these factors are not peculiar or do not constitute the defendant's signature because they are common to many child molestation cases. However, the manner and circumstances of stalking and attracting victims can be and is, in this case, sufficiently distinctive and unique that it can pass the *Golochowicz* "signa-

ture" requirement. Child abduction cases, in the overall scheme of criminal activity, are rather rare and unique and relate to aberrant behavior, i.e., there is really no "run of the mill" child abduction, as in the case of a run of the mill robbery, or car theft. The coaxing of these two girls to the actor's car is in and of itself somewhat distinctive and, when coupled with the similarities in place and time, lend to the entire act a uniqueness and distinctiveness.

The central issue in this case is identity. The evidence is material because identity is the only proposition at issue. Identity is a material issue, not because it is a factor of proof in generally all criminal cases, but because the defense has made it a genuinely controverted matter. Here, defendant does not offer any explanation for the killing, i.e., that it was unintentional or that he had some innocent purpose in inviting the victim into his car, rather he offers only an alibi defense that he could not have been the person to commit the act. Thus, the evidence, if admissible at all under MRE 404(b), could be used only to show identity.

Defendant claims that he was prejudiced by the manner in which the prosecutor argued the similar acts incident. The trial judge did not abuse his discretion in finding that the probative value of the evidence outweighs its prejudicial effect.

In his closing argument, the prosecutor argued that Amy Combs and Judy Sanchez were in fact lucky to have gotten away from this man. He argued that what happened to the victim was intended by the defendant with regard to the two girls, however, it did not come about. Thus, in effect, the prosecution stressed the defendant's bad character and his propensity to commit such an act. Although the prosecution agrees with the defense that the acts towards Judy Sanchez and

Amy Combs did not constitute a crime, he argued that the acts in effect constituted an attempt, that the defendant intended to kidnap and kill the two girls. In his closing argument the prosecutor stated:

> [I]n addition to those three eyewitnesses, you heard some testimony, quite frankly, if you listened to it, the implications of what may have happened probably had to scare you a little bit, and that was Amy Combs and Judy Sanchez, and they described an incident that sounded awfully familiar, except for the ending, as to what happened to [the victim]. . . . He said, "Come here." Why did he ask her to "come here"? Why did he ask her to do that? Not only did he do it once, he did it a couple of times. Mr. Murphy will say, Well, there is nothing wrong with what that person did, even assuming it was Mr. Lee, but we don't know what he wanted to do to her. Fortunately, Amy Combs ran away before he ever got a chance. But, again, who did both of them identify? Just another coincidence. It was Albert Lee.
>
> \* \* \*
>
> The law says that I can bring these people in here to prove to you the identity of the person, the abductor and murderer of [the victim herein].
>
> Again, compare all the similarities of what almost happened to those little girls to what did happen to [the victim], and it scares us.

It is clear that the prosecutor's closing arguments were specifically designed to convey to the jury an improper purpose for the evidence. Indeed the trial judge gave a cautionary instruction to the jury concerning the limited scope for which the evidence could be considered. In light of the fact that we have ordered a new trial on the basis of the hypnosis issue, we hold that in and of itself (i.e., absent the prosecutor's arguments) the simi-

lar acts evidence is more probative than prejudicial. While the prosecutor's use of the evidence was inappropriate in this trial, on this record the evidence was admissible. We are confident that on retrial the prosecution will confine its arguments within the permissible scope of MRE 404.

## CONCLUSION

Defendant was prejudiced to the extent that reversal is required on the basis of the admission of identification testimony by hypnotized witnesses. Although the ruling of this Court in *Gonzales* was not available at the time of trial, defendant is entitled to the benefit of the *Gonzales* holding on the basis of the retroactivity analysis under *Nixon*. The prosecution has failed to show by clear and convincing evidence that the hypnotic process and the resulting testimony was reliable and based on the facts recalled and related prior to the hypnotic sessions.

On this record, the similar acts evidence offered by the prosecution in and of itself complies with the standards of *Golochowicz*.

The decision of the Court of Appeals is reversed, and we remand the matter for a new trial.

LEVIN, J., concurred with BRICKLEY, J.

CAVANAGH, J. (*concurring in part and dissenting in part*). I join the result and reasoning of the other portions of the lead opinion, though I must write separately to express my dissent from the lead opinion's analysis of the "similar acts" issue in part III(B).

I cannot join the reasoning of part III(B) since I would hold that it was an abuse of discretion for the trial court to have admitted the testimony of

the similar acts witnesses at defendant's trial. The similar acts testimony simply does not support the inference that the defendant was about to entice the two young girls into his car, or that he was about to engage them in some other improper or criminal conduct. While this inference is necessary to support the admission of the evidence under MRE 404(b), it would be an abuse of discretion to infer that fact from this record.

If I accepted the lead opinion's reading of the record, however, I might find that the similar acts evidence is admissible under MRE 404(b). See *People v Golochowicz*, 413 Mich 298, 309-312; 319 NW2d 518 (1982). For example, if the testimony did show that the actor had stalked his victims, or sought to attract the two little girls into his car by physically reaching out to them or verbally urging them into his car for no apparent proper purpose, then I might deem such acts to satisfy the requirements of MRE 404(b). On this record, however, the similar acts simply are not so unusual and distinctive as to serve the purposes for which such evidence may be considered by the jury.[1]

I

I accept the summary of the testimony of the similar acts witnesses contained in the lead opinion. (*Ante*, pp 90-91.) The lead opinion summarizes the testimony of Amy Combs and Judy Sanchez accurately.[2]

---

[1] I need not address whether or not there was substantial evidence to show that the defendant was the man who committed the similar acts (on February 6, 1979), *Golochowicz, supra* at 309, given that the testimony of the similar acts witnesses cannot suffice to meet the requirements of the second prong of the *Golochowicz* test, *id.* at 309, 310-312.

[2] The testimony of the two girls varies somewhat, although they generally testified that the man stopped his car and put

The lead opinion characterizes the similar acts testimony in a manner that the record does not support by describing the two witnesses' version of events according to what may have occurred when the black man stopped the two young girls, rather than what actually happened to them. The acts of the man who stopped Amy Combs and Judy Sanchez may have been a prelude to a child abduction, as the lead opinion suggests (*ante,* p 95), but the girls did not testify to that.

Indeed, I am persuaded the record fails to support the lead opinion's interpretation of the testimony of the similar acts witnesses.[3] While the lead opinion states that the girls only testified that the defendant was coaxing them to come closer to the car,[4] it then draws unsupported conclusions from this testimony that the man who committed the "similar act" was "stalking" the two young girls.[5]

The similar acts evidence shows only that a man

---

one foot outside the door. He asked them for the time and the location of Hall Street. The girls responded to the questions, and after doing so the man motioned to the girls to come closer to the car. Both girls testified that they were scared and that the man recognized their fear. Judy had apparently run from the car, but Amy had stayed longer. As Judy gradually came back, the girls testified that the man got into the car and left. [*Ante,* p 90.]

[3] The lead opinion interprets the similar acts testimony as follows:

[T]he manner and circumstances of stalking and attracting victims can be and is, in this case, sufficiently distinctive and unique that it can pass the *Golochowicz* "signature" requirement. Child abduction cases, in the overall scheme of criminal activity, are rather rare and unique . . . . The coaxing of these two girls to the actor's car is in and of itself somewhat distinctive and, when coupled with the similarities in place and time, lend to the entire act a uniqueness and distinctiveness. [*Ante,* pp 94-95.]

[4] *Ante,* p 95.

[5] The lead opinion suggests that the actions of the man who stopped these two young girls is analogous to "child abduction." (*Ante,* p 95.) Yet, on this record, with only the testimony of the two girls to

stopped the two young girls on February 6, 1979, to urge them to come closer to his car (i.e., as close as six feet), at which time he asked them the time of day and for directions. Any speculation by this Court about whether this man intended to carry out some improper (or criminal) intent is only speculation and has no record support. The circumstances of this incident do not indicate that the man intended to abduct the two young girls, though he may have secretly harbored such an unlawful intent. Moreover, the man's behavior can as well be explained as motivated by a totally innocuous purpose.

Perhaps, this Court could assume facts not in evidence because the "similar acts" incident bears such a close resemblance to the fears of all parents who have worried that their children will talk to a stranger while walking alone to school. I would reject that approach, however, for obvious reasons. This Court cannot simply take judicial notice of the fact that a black man who stops young white girls to ask them the time of day and for directions is engaged in acts that are a prelude to a child abduction. Since the lead opinion makes unsupportable assumptions about the quality of the similar act that are necessary to the finding that the similar act was so unique and distinctive when compared to the charged offense as to constitute a "signature," *Golochowicz, supra* at 310-311, I must dissent.

II

The reasoning of the lead opinion does not ad-

---

describe what happened on February 6, 1979, the trial court could not have legitimately drawn the inference that the similar acts testimony was evidence of an attempted abduction. On appeal, the prosecutor conceded that the man's behavior does not even amount to an inchoate crime of any sort.

dress the question whether the similar acts evidence will be admissible on retrial. Rather, the lead opinion holds only that "[w]hile the prosecutor's use of the evidence was inappropriate in this trial, on this record, the evidence was admissible."[6] Nevertheless, there remains the important issue whether the analysis of the lead opinion can be applied if the prosecutor seeks to introduce the same evidence on retrial. The similar acts evidence may well be inadmissible, under the reasoning of the lead opinion, if the prosecutor on retrial cannot prove with substantial evidence that a black man driving a black car committed the charged offense.[7]

We simply do not know whether there will be any additional evidence to supplement this record in proving that the charged offense was committed by a black man driving a black car. The evidence in this record contains proof of that fact only if the hypnotized witnesses' testimony is admissible. Yet, the evidence is necessary to show the uniqueness and distinctiveness of the "similar act" because it links the similar act to the charged offense in the manner required by MRE 404(b).

Under the first prong of the *Golochowicz* four-part evidentiary safeguards, there must be "substantial evidence that the defendant actually perpetrated the bad act sought to be introduced," *id.* at 309. In analyzing this prong of the test, the lead opinion finds that there was substantial evidence to show that the defendant was the perpetrator of the similar act. The lead opinion reaches this conclusion, despite the tentativeness of the witnesses' eyewitness identification of him, because of two additional, and crucial, facts:

---

[6] *Ante,* p 97.
[7] See discussion below.

[1] the man had a black car and that defendant
drives a black car, [and]
[2] that defendant did not go to work on Febru-
ary 6 . . . .[8]

The fact that the defendant did not go to work
proves very little, since it is the prosecutor's bur-
den of production and persuasion to prove by
substantial evidence that the defendant committed
the similar act.[9]

The fact that the perpetrator of the charged
offense was a black man and drove a black car
plays an important role in the lead opinion's
finding that this "similar acts" evidence was prop-
erly admitted for an additional reason. Under the
second prong of the *Golochowicz* standard, when
(as here) "the only conceivable justification for
admission of such similar-acts evidence is to prove
the identity of the perpetrator, . . . '[t]he [com-
monality of circumstances] [between the act and
the charged offense] must be so unusual and dis-
tinctive as to be like a signature,' " *id.* at 310-311
(citation omitted);[10] see *ante,* pp 93-94; see also
*People v Hall,* 433 Mich 573, 586; 447 NW2d 580
(1989).[11] Indeed, if there is no substantial evidence

---

[8] *Ante,* p 93.

[9] The defendant is not required to give proof of an alibi in his own
defense in order to justify the exclusion of evidence of extrinsic acts if
the prosecutor cannot prove with substantial evidence that, given the
qualities of the charged offense and the similar act, he was the
perpetrator of both acts.

[10] The finding of similarity between the similar act and the charged
offense cannot be dispensed with since it, "assures thereby that
evidence of the separate offense is probative of some fact other than
the defendant's bad character . . . [namely, that] the circumstances
and manner in which the two [acts] were committed are '[s]o nearly
identical in method as to earmark [the charged offense] as the
handiwork of the accused . . . .' " *Id.* at 310, citing McCormick,
Evidence (2d ed), § 190, p 449.

[11] In *Hall,* the plurality stated that "[t]o be sure, where the prosecu-
tion uses similar acts to prove the identity of a perpetrator, the
commonality of circumstances must be unique and distinctive." While

linking the similar act to the charged offense, then there is no basis for the admission of the similar acts evidence to prove identity under MRE 404(b).

In analyzing the second prong of the *Golochow- icz* standard, the lead opinion relies, in large part, on the fact that a black man driving a black car was seen both during the commission of the charged offense and during the similar act; indeed, this fact serves as the key factor which proves the similarity between the charged offense and the similar act that MRE 404(b) requires.[12]

Given today's holding that the testimony of the hypnotized witnesses who saw a black man in a black car at the scene of the charged offense "is inadmissible absent proof by clear and convincing evidence that the testimony being offered [to show that it] was based on facts recalled and related prior to hypnosis," (*ante,* p 86), the testimony of these witnesses may be inadmissible upon retrial.[13]

this language is dicta from a plurality opinion by Justice BOYLE (joined only by Justice GRIFFIN and Chief Justice RILEY), that sentence is nevertheless an accurate statement of the law.

[12] The lead opinion reasoned that the similar act is sufficiently unusual and distinctive when compared to the charged offense because both acts share four factors in common:

> The similarity between the two incidents upon which the prosecutor bases its admission are that (1) both incidents involved a black man driving a black car, (2) each occurred in the early morning hours when children would be walking to school, (3) both incidents involved young girls, and (4) both occurred in the same general area. [*Ante,* p 94.]

[13] The fact that the charged offense was committed by a black man in a black car was established at the first trial by the testimony of the hypnotized witnesses. In fact, these witnesses were the only ones who identified the racial background of the perpetrator of the charged offense and the color of the car he drove at the scene of the abduction on February 12, 1979.

The trial court considered the testimony of the hypnotized witnesses in making a preliminary ruling on the admissibility of the "similar acts" evidence under MRE 404(b).

The lead opinion states:

ARCHER, J., concurred with CAVANAGH, J.

BOYLE, J. (*dissenting in part and concurring in part*). We dissent. The majority has applied the *Frye/Davis* test and reversed the defendant's conviction despite the fact that the defendant was identified by witnesses who were never subjected to suggestion. Further, the majority fails to engage in any meaningful separate analysis of the testimony of each witness. The overwhelming evidence in this case convinces us that the conviction of Albert Lee, III, did not constitute a miscarriage of justice. We concur only in Justice BRICKLEY's result that the prior act testimony, MRE 404(b), was properly admitted, although we do not endorse the reasoning.

The point ignored by the majority in this case is that at the time of the initial hypnosis, the identity of the defendant was unknown to the police officers. Thus, on this record it is indisputable that there was no connection between that hypnosis and the witnesses' later selection of the defendant from a lineup. Secondly, since the defendant's expert witness, Dr. Martin Orne, testified that hypnosis had no bearing on the identification of the car by the four witnesses who identified it before, during, and after hypnosis as a clean, black Grand Prix, it is indisputable on this record that identification of the vehicle was reliable. Thirdly, Dr. Orne testified that the defendant's ownership of the car was corroborative evidence of the reliability of the identification of the defendant. Finally, and most significantly, Dr. Orne also testified that the identification of the defendant by Jack Hill and Jack Vos was *not* the product of the

---

[The testimony of the two girls] alone probably does not constitute substantial evidence to show that it was defendant who committed the bad act. [*Ante,* p 92.]

hypnotic sessions. Despite these undisputed facts, the majority simply avoids any meaningful discrete analysis of the testimony and erroneously concludes that the conviction must be reversed because the identification was corrupted by the "suggestive effect of hypnosis," on the unfounded assumption that the hypnosis *somehow* induced the identification testimony.

The assumption that hypnosis renders a witness incompetent to testify is a proposition we rejected in *People v Nixon,* 421 Mich 79; 364 NW2d 593 (1984). While we did say in *Nixon* that a witness could testify on the basis of facts recalled and related prior to hypnosis, we did not say that this was the only way that "the party offering the testimony" could establish its reliability. *Nixon, supra,* p 90. As this case illustrates, such a broad prophylactic rule is unwarranted.

The majority opinion gives the state another opportunity to show reliability at the retrial it orders today. However, the fallacy in the majority's formulation is that it would appear that comparison of a witness' general description of a suspect with the defendant's actual appearance would rarely produce a conclusion that the taint is dissipated, except in the rare case of a defendant who has unique identifying characteristics. On this record, the majority formulation in application thus all but obliterates the distinction drawn in *Nixon.*

Even more disturbing, the majority's wholesale application of *Nixon* to all the witnesses who were hypnotized, obscures any meaningful examination of prejudicial error. MCL 769.26; MSA 28.1096. Inexplicably ignored is the fact that the defendant admitted to a cellmate that he "accidentally" killed the victim while attempting to sexually molest her. Consciousness of guilt was shown by a

false exculpatory statement that the defendant was at the Secretary of State's office at the time of the abduction. On the morning of Linda Vanderveen's abduction, two men observed a black male, who smoked Kool cigarettes and drove a black car with bicentennial plates, throw something into a dumpster located within one mile of where the victim's body was found. Other evidence established that the defendant smoked Kools, had bicentennial plates, and drove a black car. Linda's knapsack was recovered from the dumpster. Only three black men in Kent County, one of whom was the defendant, owned a 1976 or 1977 Grand Prix with a red interior. A barrette, feathers that came from mittens similar to those of the victim, and long blond hairs were found in the defendant's car. A number of short black Negroid type hairs were found on Linda's body, as were orange carpet fibers similar to those in the defendant's car. The testimony of Amy Combs and Judy Sanchez indicated that the defendant had approached two young girls for directions six days before Linda Vanderveen's abduction, one mile from where she was kidnapped. The defendant's admission to his cellmate, if believed by the jury, was itself sufficient to support the verdict. Absent the "tainted evidence," the remaining evidence of guilt was compelling. The case was magnificently tried by two able advocates before a scrupulously fair judge. Upon a review of the entire evidence, it cannot be said that Albert Lee, III, did not receive a fair trial. We would affirm the conviction below.

I

In *People v Gonzales,* 415 Mich 615; 329 NW2d 743 (1982), modified 417 Mich 968 (1983), we applied the *Frye* test to hypnosis and concluded that

testimony which had been "tainted" by hypnosis should be excluded from criminal trials. Two years later, in *People v Nixon, supra,* p 90, we declined to declare incompetent any witness who had been hypnotized, holding instead that a witness could testify subsequent to hypnosis when the party offering the testimony could show by clear and convincing evidence that the testimony was "based solely on facts recalled and related prior to hypnosis . . . ." We are persuaded that *Nixon's* rejection of the rule of incompetence per se is correct. However, having there held that the testimony of a witness who has been hypnotized is admissible if shown to be reliable, it must follow that *Frye v United States,* 54 App DC 46, 47; 293 F 1013 (1923), should not be applied in these circumstances.[1] As the majority's result demonstrates, it can be argued with expert support that every witness who has undergone hypnosis is somehow influenced by that experience. If *Frye* is applied to the testimony of any witness who has been hypnotized, it must follow logically that all such testimony is inadmissible unless and until hypnosis receives general acceptance in the scientific community, the very proposition we rejected in *Nixon.* In short, either we were wrong in *Nixon* and all such testimony is inadmissible per se, or there is a distinction between testimony recalled during hypnosis, as to which *Frye/Davis* may still be applicable, and testimony which has not been affected by hypnosis despite the fact that the witness was hypnotized, as to which *Frye* does not apply.

This case vividly demonstrates that the application of *Frye* to identifying witnesses who have

---

[1] The *Frye* test is concerned with the admission of expert testimony deduced from the results of a scientific technique. The issue in these cases is not the admissibility of the testimony of a hypnotist regarding observations or statements made during hypnosis but, rather, the admissibility of testimony by lay witnesses in their normal state.

undergone hypnosis forces the state to choose between use of hypnosis during the investigative stage and the potential loss of the witness' testimony at trial, *Nixon, supra,* p 90. We do not agree with the majority's assertion that the loss of testimony in this case results only because the testimony of the witnesses was not preserved prior to hypnosis. Application of the *Frye* rule in this case and virtually all others will exclude subsequent identification if hypnosis is employed prior to actual identification of a defendant.

However, while *Frye* should not be applied simply because of the fact of hypnosis, the basic reason for the *Frye* rule obtains, that is, concern whether the traditional means of assuring reliability of testimony are, in a given context, adequate to ensure prosecutorial fairness and just results. Hypnosis undoubtedly poses special problems which justify the application of the heightened reliability standard required in *Nixon,* that is, that reliability must be shown by clear and convincing evidence. Thus, while we would modify the *Nixon* formulation, we would not adopt the rule that the fact of hypnosis applies only to credibility and not admissibility. *United States v Awkard,* 597 F2d 667, 669 (CA 9, 1979), cert den 444 US 885 (1979).[2]

Courts have taken three basic approaches to the admissibility of posthypnosis testimony: automatic admission, automatic exclusion, and admission conditioned on compliance with detailed procedural safeguards.

Under the first approach, the testimony of a witness who has been hypnotized is viewed as present recollection refreshed by hypnosis. *Awkard, supra,* p 669. The fact and effect of hypnosis

[2] I would not alter the well-established rule that statements made under hypnosis are inadmissible, McCormick, Evidence (3d ed), § 206, p 632.

apply to weight and not admissibility, *id.; State v Brown,* 337 NW2d 138, 151 (ND, 1983); *Chapman v State,* 638 P2d 1280, 1282 (Wy, 1982).

The second approach, inadmissibility per se, was adopted in *People v Shirley,* 31 Cal 3d 18; 181 Cal Rptr 243; 641 P2d 775 (1982). Courts taking this approach typically draw their conclusions from application of the *Frye* rule of scientific acceptance. See *State v Mena,* 128 Ariz 226; 624 P2d 1274 (1981); *State ex rel Collins v Superior Court,* 132 Ariz 180; 644 P2d 1266 (1982); *Polk v State,* 48 Md App 382; 427 A2d 1041 (1981). Michigan is among those states that initially adopted a rule of inadmissibility per se but thereafter allowed a witness to testify regarding facts recalled prior to hypnosis, *Nixon, supra;* see also *Collins, supra.* As already suggested, permitting a witness to testify as to identification of a defendant after he has been hypnotized is logically inconsistent with the *Frye* rule, since there is not general acceptance in the scientific community of the reliability of post-hypnotic testimony.

The third and preferable approach allows admission of posthypnosis testimony when, in the particular case, it is found to be reliable. See *People v Romero,* 745 P2d 1003 (Colo, 1987); *State v Iwakiri,* 106 Idaho 618; 682 P2d 571 (1984); *State v Woodfin,* 539 So 2d 645 (La App, 1989). The reliability centered approach is articulated in *State v Hurd,* 86 NJ 525, 538; 432 A2d 86 (1981), in which the New Jersey court held that the use of hypnosis could satisfy *Frye* in certain instances.[3] Thus, in *Hurd,* hypnotically induced recall was held admissible if the proponent of the evidence could show that the use of hypnosis in the particular case was

[3] The *Hurd* court's use of *Frye* on a case-by-case basis seems somewhat anomalous since the *Frye* inquiry concerns the "general acceptance" of a scientific principle or method. *Frye,* p 47.

"a reasonably reliable means of restoring a person's memory." *Id.* The *Hurd* court adopted the procedural recommendations of Dr. Orne, the defense expert in this proceeding. *Id.,* pp 545-546.

Compliance with the Orne safeguards does not guarantee admissibility of the testimony; it merely provides a basis to assess its reliability. *Id.,* p 546. Thus, even when the safeguards are followed, circumstances may suggest that the testimony of a witness who has undergone hypnosis is not reliable. For instance, where the posthypnotic testimony is identification of a person known to be under suspicion by a witness who has been previously unable to identify the person, the danger of suggestion through hypnosis is evident. *United States v Valdez,* 722 F2d 1196, 1203 (CA 5, 1984). On the other hand, even where the conditions of hypnosis do not meet the Orne standards, an independent basis for posthypnosis identification may compensate for the deficiencies of the hypnotic session.[4]

---

[4] Factors which might be relevant in making this determination would be analogous to those set forth in *People v Kachar,* 400 Mich 78, 95-96; 252 NW2d 807 (1977). These factors are:

1. Prior relationship with or knowledge of the defendant.

2. The opportunity to observe the offense. This includes such factors as length of time of the observation, lighting, noise or other factor affecting sensory perception and proximity to the alleged criminal act.

3. Length of time between the offense and the disputed identification. See [*People v*] *Anderson,* 389 Mich [155, 214; 205 NW2d 461 (1973)], for analysis of the curve of forgetting.

4. Accuracy or discrepancies in the pre-lineup or showup description and defendant's actual description.

5. Any previous proper identification or failure to identify the defendant.

6. Any identification prior to lineup or showup of another person as defendant.

7. Still another consideration, not mentioned in [*United States v*] *Wade* [388 US 218; 87 S Ct 1926; 18 L Ed 2d 1149 (1967)], but essential to a determination of judging the reliability of the witness's perceptions is the nature of the alleged

Where posthypnosis identification is otherwise shown to be reliable, the rationale for *Nixon* is served and there is no purpose in limiting identification evidence to facts "related and recalled" prior to hypnosis. As the court noted in *Harker v Maryland,* 800 F2d 437, 442 (CA 4, 1986), suggestibility and memory hardening are concerns whenever a witness makes an identification. While exclusion would certainly remedy those problems, it would also sacrifice probative evidence which might be sufficiently reliable in a particular case to aid in the truth-finding process. In the context of posthypnosis identification particularly, the rule sweeps too broadly, eliminating reliable and unreliable evidence alike and insuring that, as a practical matter, "the police will seldom dare to use hypnosis as an investigatory tool because they will thereby risk making the witness incompetent . . . ." *State ex rel Collins, supra,* p 209.

The more prudent balance should be struck by requiring a preliminary determination of admissibility on a case-by-case basis. Using a flexible test informed in particular by the Orne factors, the court should, pursuant to MRE 104, make a determination of the reliability of the evidence sought to be presented. If posthypnosis testimony is found

---

offense and the physical and psychological state of the victim. "In *critical situations* perception will become distorted and any *strong* emotion (as opposed to mildly emotional experiences) will affect not only what and how much we *perceive,* but also will affect our *memory* of what occurred." 389 Mich 211. (Emphasis in original.)

Factors such as *"fatigue, nervous exhaustion, alcohol and drugs,"* 389 Mich 213 (emphasis in original), and age and intelligence of the witness are obviously relevant. Levine and Tapp, *The Psychology of Criminal Identification: The Gap from* Wade *to* Kirby [v Illinois, 406 US 682; 92 S Ct 1877; 32 L Ed 2d 411 (1972)], 121 U Pa L Rev 1079, 1102-1103 (1973).

8. Any idiosyncratic or special features of defendant.

Additional factors would be the existence and amount of corroboration.

sufficiently reliable for admission, the parties remain free to make the jury aware of the dangers of hypnosis with expert testimony and to cross-examine the identifying witness as to the conditions of hypnosis and any independent basis for observation.

II

The identity of the defendant was not suggested to any witness during or after hypnosis. The initial hypnotic sessions were conducted by local hypnotist, Robert Mazur, on the day of the abduction and two days later on February 14, 1979. At this time, the police were acting on seven hundred to nine hundred tips, with as many suspects. Since Mr. Mazur himself could have known nothing about the defendant's identity, it is clear beyond question that he could not, even inadvertently, have suggested the identity of the defendant to the witnesses. The second hypnosis of the witnesses was conducted on February 23, 1979, still before defendant became the primary suspect. Commenting on the fact that witness Jack Hill could make no identification immediately before, during, or after his second hypnosis, Dr. Orne opined that the hypnotic sessions were carried out with some care, and that if the authorities knew who was believed to be responsible for the crime, it was not communicated to the hypnotized individual. While not all of the Orne safeguards were employed in the hypnotic sessions of February 12, 14 and 23, 1979, it is evident on the record that there was no suggestion of the defendant's identity.

As the majority notes, there were seven prosecution witnesses in this case who were hypnotized. (Jack Hill, James Vos, Jack Vos, Greg Start, David Orr, Jr., Timothy Wilcome, and Jim Bonnema).

*Ante,* p 65. Proper analysis requires an examination of the circumstances surrounding testimony of each of these witnesses' identification.

Jim Bonnema testified only that he saw a clean, black, 1976 or 1977 Grand Prix automobile speeding through the vicinity of the abduction at 8:15 A.M. Bonnema saw a young black man driving the car but could not identify the defendant as the driver. There was additional evidence that the defendant was one of three black men in Kent County who owned a 1976 or 1977 black Grand Prix with a red interior. Nevertheless, Bonnema was unable to give either the color of the interior of the vehicle he saw, nor was he able to give the license number of the car.

Similarly, James Vos was only able to identify the vehicle as a black Grand Prix. Vos was unsure of the year of the vehicle and gave no testimony as to the color of the interior. James Vos gave only a general description of the driver, a twenty- to thirty-year-old black male with a medium afro hair style and a dark leather jacket. He was unable to identify the defendant as the driver of the vehicle.

Dr. Orne testified that hypnosis had no bearing on the testimony of these witnesses as to identification of the car involved in the abduction:

> *Q.* [*Assistant Prosecutor*]: Now, again, you have no difficulty, given the sequence of the identification of the car in this case, that these witnesses who have identified a black Grand Prix actually saw—at least they think they actually saw a black Grand Prix?
> *A.* [*Dr. Orne*]: I have no reason to doubt that particularly. I have no reason to agree with it. I take that . . .
> *Q.* In other words, in your opinion the hypnosis had no effect on that identification of the car.

*A.* Given the facts the people identified it before
in the same way as they identified it after. If it
had been identified as a '76 before, then became a
'77 afterwards, then I would worry about the
hypnosis having an effect.

*Q.* But the mere fact we are talking, now, about
the Grand Prix, itself, it was before, it was during,
and it was after, and it is your opinion that
hypnosis had no effect on that identification?

*A.* I'd say reasonably. This is for everyone except
Mr. Hill.

Therefore, the trial judge did not err in admit-
ting the testimony of Jim Bonnema and James
Vos.

Turning next to the question whether Jack
Hill's testimony was shown to be reliable by clear
and convincing evidence, we find ample support
for the trial court's Rule 104 determination. There
was clear and convincing evidence that Hill's
identification was the product of independent rec-
ollection. Jack Hill witnessed the last stages of the
abduction and identified Mr. Lee at the second
lineup and at the trial. The abduction occurred at
8:00 A.M. in "good" light. There was very little
snowfall at the time. Hill observed the defendant
from about four feet away. He spoke briefly with
the defendant and noticed a lack of accent or
slang. While Hill failed to identify the defendant
upon viewing two mugbooks and one corporeal
lineup, at the first lineup, all of the participants
put their hair in "cornrows." There was nothing in
the record to suggest that Hill was suffering from
fatigue, nervous exhaustion, or alcohol or drug
use, and Hill ultimately picked the defendant out
of a corporeal lineup some six weeks after the
abduction.

Most significantly, the majority simply fails to
acknowledge that Judge Boucher based his ruling

on the effect of the hypnosis on Jack Hill on the testimony by the defense expert Orne. Dr. Orne not only testified that there was no deliberate attempt to alter the memory of Mr. Hill through hypnosis, *but also concluded that the hypnosis was not the source of Mr. Hill's memory.*[5]

It is clear from this testimony that, while Dr. Orne did not believe that Hill's identification was actually based upon memory, Dr. Orne was convinced that the identification was not the product of hypnosis, but of some "third events."

Additionally, Dr. Orne acknowledged at trial that corroborating facts were significant to the

[5] Dr. Orne gave the following testimony at the pretrial motion to suppress:

It is very unlikely, in my view, that the identification which took place was based upon an actual memory of the original events—a personal memory of the original events of either Mr. Hill or Mr. Vos. The reason for that is that if the memory trace was there, the recall was possible, then it should have been elicited either originally before hypnosis or by hypnosis with Mr. Mazur, or by hypnosis with Dr. Rossi. You will recall that the unreliability of hypnosis stems from the fact that you cannot distinguish between actual recall of what you saw and the importation of additional materials, additional details which are confabulated. Nobody questions the fact that hypnosis will facilitate getting recall of what there is in the memory system. So since you didn't get it at those points, the likelihood of what you are getting much later being an actual memory is extremely small.

[*Defense Counsel*]: Why is that?

[*Dr. Orne*]: Because if it were a memory, it should have come forth earlier and in our view, it is very unlikely that if you have got two people who have repeatedly failed to identify someone and failed to identify him under two hypnotic sessions, failed to bring forth the memory trace, if you will, so that there is recall, then a month and a half later about the same time they both suddenly are able to identify someone, that this new basis for identification comes from their individual memories, their original memories, *it is more likely to come from third events which the two of them somehow shared,* and for that reason it strikes me as extremely unlikely that we are talking about a memory. I don't know whether what they identified is right or wrong. I have no way of judging that. I can only say it didn't appear to come from memory. [Emphasis added.]

determination of whether the testimony was based
on actual memory, and he admitted that he had
been unaware of the corroborative physical evi-
dence of blond hairs, carpet fiber, barrette, or
feathers prior to his testimony.[6]

---

[6]  *Q.* Would you consider it corroboration, Doctor, again, of the
identification of both the car and the person—that the little
girl in this case, when she left home that morning, had two
barrettes in her hair, and that when she was found, there was
only one barrette left on her body, and a barrette of the same
kind was found in Mr. Lee's car?

*A.* What is a barrette?

*Q.* A barrette is to tie your hair back, to hold your hair back,
a clip, or whatever you want to call it.

*A.* Okay, yeah.

*Q.* Would you consider that corroboration?

*A.* I would consider that, certainly, a kind of corroboration,
right.

*Q.* Did Mr. Murphy provide you that information?

*A.* No.

*Q.* Did he provide you the information about the number of
cars in town?

*A.* No, he did not.

*Q.* Would you consider the fact there were 16 blond hairs
found in the back seat of Mr. Lee's car, which are identical in
all respects that could be tested for, to the victim's hair? Would
you consider that corroboration, again, of the identification of
the car and the identification of Jack Hill and Jack Vos?

*A.* I think you are really asking me to kind of get outside of
what my area of which I am competent in. I would say yes,
that is very convincing from one point of view. But in a sense,
the real question is where did the identification come from?

*  *  *

*Q.* Again, if the carpet fibers in Mr. Lee's car were identical
to fibers found on the girl's clothes, that is, again, another type
of corroboration we are talking about?

*A.* Again, assuming that the carpet fibers are rare or specific
to that car, certainly.

*Q.* And the same thing, if feathers found on the girl's clothes
were like the feathers found in Mr. Lee's car, would you
consider that corroboration?

*A.* I consider that kind of evidence certainly germane.

*Q.* Mr. Murphy [defense counsel] didn't provide you with that
information?

*A.* No.

*Q.* Now, again, if the testimony shows that after this first
line-up at which nobody identified Mr. Lee, from that point

Curiously, the majority asserts that Dr. Orne's comment regarding corroborative evidence was outside the area of his expertise. In fact, Dr. Orne testified that reference to corroborative facts is a means by which experts determine that a post-hypnosis memory is a true memory. However, whether Dr. Orne concluded that Hill's identification of the defendant was the result of "third events" or his "alternative hypothesis," i.e., Hill's actual memory, is irrelevant. The fact that identification was not the product of the hypnosis stands uncontroverted on this record. Thus, the issue of the reliability of Hill's identification of the defendant was an issue properly submitted to, and resolved by, the factfinder. The trial court's preliminary ruling admitting the testimony of Jack Hill was not erroneous.

Although Jack Vos, the seventeen-year-old son of James Vos, had considerably less time in which to view the defendant than Jack Hill, as with Jack Hill, the testimony by the defense expert, Dr. Orne, is dispositive of admissibility. Dr. Orne's testimony that Jack Hill's identification of the defendant was not the product of hypnosis applied equally to Jack Vos. Moreover, Dr. Orne's testimony as to the significance of the corroborating evidence also applies to Jack Vos. Whatever differences might exist in the initial observation by Jack Vos, there was no error in the admission of his testimony.

Timothy Wilcome was employed as a mainte-

---

until they did identify him at the second line-up, none of those witnesses, that is, Jack Hill and Jack Vos, saw any more pictures of the Defendant, nor saw the Defendant, nor were told or given any information about Mr. Lee by any police officers, nor did they talk to one another. Do you have any idea or opinion as to why they identified him?

*A.* As I have indicated before, I don't know. There is an alternative hypothesis. *It could be that that is the person that they actually saw.* [Emphasis added.]

nance man at the Georgetown Apartments on the morning of February 12, 1979. He was cleaning snow at approximately 10:00 a.m. when a black male approached him on foot. The man asked Wilcome for a push, explaining that his car was stuck in the snow. Wilcome agreed to help him, and the two walked to his car. After an unsuccessful attempt to push the car out by hand, Wilcome suggested that they ask his coworker, David Orr, to pull the car out with his truck.

While Orr hooked up the car, Wilcome spoke to the individual. Wilcome asked for a cigarette and was given a Kool cigarette. Wilcome then pushed the car while Orr pulled the car with the truck. Wilcome testified that the car was a black Monte Carlo in good condition. He did not notice any particular details about the car or any writing on it but identified it by the body size and shape. Linda Vanderveen's knapsack was uncovered from a nearby dumpster later that day.

Wilcome was interviewed by the investigating officers two days later on February 14, 1979. He was hypnotized by Mr. Mazur and later shown a mugbook containing the defendant's photograph. Wilcome failed to identify the defendant from the photograph and in fact selected another photograph as "close."[7] The following day, Wilcome was shown a second mugbook without the defendant's photograph. He selected no one.

About ten days later, Wilcome attended the first corporeal lineup in which all of the participants appeared with hair styled in cornrows. He was hypnotized prior to the lineup by Dr. Rossi of the Michigan State Police. Wilcome was unable to pick out the defendant "confidently," but did select the

[7] My review of the mugbook indicates that number 217, the picture selected by Wilcome, clearly *does* resemble the defendant. David Orr also selected number 217 out of this mugbook.

defendant as closest to the man he had seen on February 12. At the March 15 lineup, when the participants appeared in afro-styled hair, Wilcome was again unable to "confidently" pick out the defendant. Again, however, he picked out the defendant as closest in resemblance to the man he had seen on February 12. Wilcome also identified the defendant at trial but was similarly unable to give a "confident" identification.

The evidence of record establishes that Timothy Wilcome had an excellent opportunity to observe the defendant for some time, including speaking with him. The lighting was good, there was proximity, and there was nothing startling in the encounter. Wilcome failed to identify the defendant at the first photographic viewing, but he did pick out the defendant in the "cornrow" lineup about ten days later.

David Orr also worked in maintenance at the Georgetown Apartments on February 12, 1979. However, Orr had no direct conversation or contact with the defendant and never identified the defendant as the driver of the car. Orr did identify the car as a black Monte Carlo. It appears that Orr's testimony was offered for two purposes: first, to provide a general corroboration of Wilcome's testimony, and, second, to establish that the driver of the car, identified by Wilcome as the defendant, threw something into the dumpster in which Linda Vanderveen's knapsack was found. Orr also testified that the defendant left the scene "in a hurry" after he was towed out of the snowbank.

Here again Dr. Orne's testimony must be examined. Dr. Orne gave no specific opinion either at the pretrial hearing or at trial regarding the effect of the hypnosis on the testimony of Timothy Wilcome. However, the circumstances and quality of Wilcome's initial observation supported the trial

court's determination that Wilcome's testimony was based on factors unrelated to the hypnosis.[8] Further, Dr. Orne, did not believe that the descriptions of the vehicle were affected by hypnosis. Assuming arguendo that Orr's description was unreliable, any error in the admission of this testimony must be deemed harmless. Orr's consistent description of the vehicle as a *Monte Carlo* was, in fact, exculpatory. Orr was never able to give a description of the defendant and never identified him. Thus, the only potential prejudice to the defendant that would flow from the testimony of David Orr is the general corroboration of Wilcome's account of pulling someone out of a snowbank and Orr's testimony that he saw the driver afterward throw something into a dumpster. The admission of this evidence presents no basis for a reversal of the defendant's conviction.

Finally, turning to the testimony of witness Greg Start, Dr. Orne expressed particular concern as to the possibility of hypnotic suggestion in Start's identification. He believed that Start was particularly vulnerable to suggestibility and was concerned about the use of a posthypnotic suggestion by Dr. Rossi to the effect that Start would be able to identify the person he saw on the day of the incident.[9] Start, a twelve-year-old safety boy, arrived at his post a few blocks from the scene of the abduction at about 8:00 A.M. on February 12, 1979. He testified that a little while after he arrived at his post, he saw a black Grand Prix with a red interior speed through the intersection. He further testified that the driver of the Grand

---

[8] Although not all of the Orne controls were used during hypnosis, the circumstances in the hypnotic sessions were the same as those of Jack Hill and Jack Vos, and Orne testified that those sessions were not the source of either witness' testimony.

[9] In contrast, it may be fairly inferred from the trial testimony of Dr. Orne that the other witnesses were not given this suggestion.

Prix was a young black man, about twenty-five years old, with a mustache and a three-inch afro. The car went through the intersection "medium" fast. According to Start, the driver looked in his rear view mirror after he went through the intersection. Start saw the same car a few blocks away six or seven minutes later.

Start did not see the car again, but he did see Jack and Jim Vos. They pulled over moments later and asked Start if he had seen a black Grand Prix. Start replied that he had not, but remembered a few minutes later that he had seen a black Grand Prix.

In March or April of 1979, Start saw an article in the Grand Rapids Press about the defendant's arrest. A picture of the defendant ran with the article.

Start was finally contacted by the investigating officers on May 2, 1979. The record is unclear as to whether he was shown mugbooks with the defendant's picture. However, it is clear that Start had seen a picture of a person identified as the suspect prior to being hypnotized by Dr. Rossi on June 19, 1979, and viewing a lineup on June 20, 1979. Start picked out the defendant in the lineup and later identified the defendant at trial.

Unlike the other witnesses whose hypnosis was conducted before defendant became the primary suspect, Start was hypnotized subsequent to defendant's March 29 arrest. The danger of suggestibility as to Start was heightened by the fact that prior to hypnosis, Start had seen defendant's picture in the newspaper and had been given a posthypnotic suggestion. In short, unlike the other witnesses, there is a basis in this record to find both that Start was subject to suggestion as to the identity of the suspect, and that the prosecution

has failed to show by clear and convincing evidence the reliability of his testimony.

Two final observations regarding the hypnotized witnesses are in order. Except as to Greg Start, Dr. Orne found no indication of cuing or suggestion in the hypnotic sessions.[10] Thus, except as to Start, the potential danger of suggestibility was negated on this record. Second, the evidence in this case includes three mugbooks containing a total of 316 pictures. Additionally, there are photographs of three lineups, two containing eight persons and one containing six. As the experienced and scrupulous trial judge observed, the "utterly bewildering array" of mug shots shown the witnesses, together with the care with which the photographic and lineup sessions were conducted, actually increased the reliability of the identification testimony.[11]

---

[10] In the interest of time, defense counsel did not provide Dr. Orne with tapes of the hypnosis of David Orr and Timothy Wilcome at the motion hearing. However, counsel instructed Dr. Orne to assume the procedures for these sessions were the same as for the others. Dr. Orne also was not provided with tapes of Jim Bonnema's hypnosis, again presumably in the interest of economy. I note that no question was raised at the motion hearing or at trial about the availability of the tapes.

[11] In ruling on the defendant's motion to suppress pretrial and in-court identifications, the trial judge stated:

[W]hat is amazing here is not any set of circumstances which would force witnesses into identification of this Defendant, but the fact that witnesses purport to make an identification after exposure not to the Defendant repeatedly but to an utterly bewildering array of young, black males whose characteristics in many instances differ in only very subtle respects. It seems to me that an equally convincing argument can be made for the assembly of showdowns here, that the reliability of identification has been enhanced, as that it has been made unreliable. Not only were the photographic and line-up sessions not tainted, but they were carried out, in the view of this Court, with scrupulous care given to fairness by personnel of both the Grand Rapids Police Department and the Kent County Sheriff's Department.

CONCLUSION

For the reasons explained, we would hold that the *Frye* test should not be applied to exclude the testimony of a witness simply because he has been hypnotized. The dangers of hypnosis do, however, require application of a *Hurd*-type test in which the reliability of the testimony must be established by clear and convincing evidence. The test to be employed is flexible; the primary considerations in the reliability determination are whether the appropriate safeguards were employed at the hypnotic session, and whether the testimony offered has a basis independent of hypnosis. So analyzed, we conclude that error occurred in this case only in regard to the admission of Gregg Start's testimony, but that error does not compel reversal.

The Code of Criminal Procedure provides:

> No judgment or verdict shall be set aside or reversed or a new trial be granted by any court of this state in any criminal case, on the ground of misdirection of the jury, or the improper admission or rejection of evidence, or for error as to any matter of pleading or procedure, unless in the opinion of the court, after an examination of the entire cause, it shall affirmatively appear that the error complained of has resulted in a miscarriage of justice. [MCL 769.26; MSA 28.1096.]

The prosecution built an impressive direct and circumstantial case involving over fifty witnesses and six days of trial. The prosecution established that only three cars matching the defendant's car were owned by black males in Kent County. A barrette, matching a second one worn by the victim was found in the back seat of the defendant's car. Feathers, such as those in the victim's gloves, and long blond hairs were also found in the back

seat of the defendant's car. Carpet fibers matching those of the defendant's car and Negroid type hairs were found on the victim's clothing, and a cellmate of the defendant's testified that the defendant had admitted that he accidentally killed the victim while attempting to sexually molest her. The defendant's alibi was effectively rebutted by testimony that placed him at the Secretary of State's office several hours after the abduction, rather than at the time of the abduction as the defendant testified.

The erroneous admission of Greg Start's testimony did not result in a miscarriage of justice. The defendant's conviction should be affirmed.

RILEY, C.J., and GRIFFIN, J., concurred with BOYLE, J.